HOFFMANN–LaROCHE, INC., Plaintiff,

v.

Caspar W. WEINBERGER et al., Defendants.

Civ. A. No. 75–270.

United States District Court, District of Columbia.

July 29, 1975.

Andrew S. Krulwich, Washington, D. C., for plaintiff.

A. Douglas Melamed, Washington, D. C., for intervenor.

Ann S. DuRoss, Asst. U. S. Atty., Washington, D. C., Eugene M. Pfeiffer, Associate Chief Counsel for Enforcement, Food & Drug Administration, Rockville, Md., for defendants.

## MEMORANDUM OPINION

JUNE L. GREEN, District Judge.

This matter is before the Court on plaintiff's Motion for Summary Judgment and defendants' Cross-motion for Summary Judgment, or in the Alternative, to Dismiss. After hearing Arguments thereon, the Court makes the following findings of fact and conclusions of law.

Plaintiff, Hoffmann-LaRoche Inc., has brought suit for declaratory and injunctive relief. It seeks a declaration that the Food and Drug Administration (the FDA) has acted contrary to the statutory requirements of the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 (1970) *et seq.* and the rulemaking provisions of the Administrative Procedure Act, 5 U.S.C. § 553 (1970). Specifically, Hoffmann-LaRoche challenges the FDA's policy of permitting the introduction of a new drug in interstate commerce without first approving a new drug application for such drug as required by 21 U.S.C. §§ 331, 355 (1970). Further, it seeks to declare such policy void because it has been adopted without notice or publication of its proposed action in the Federal Register, thereby depriving interested parties of their right to comment on such policy prior to its adoption.[1]

Plaintiff is a New Jersey corporation engaged primarily in the manufacture and sale in interstate commerce of pharmaceutical products. Hoffmann-LaRoche is the holder of three approved new drug applications for compounds which contain chlordiazepoxide or chlordiazepoxide hydrochloride (both hereafter referred to as "chlordiazepoxide"). Plaintiff markets these drugs under the trademark "Librium". Since 1959, when Hoffmann-LaRoche first filed a new drug application for chlordiazepoxide, Hoffmann-LaRoche has marketed the drug only after it has obtained approval by the FDA of its new drug applications.

On January 20, 1975, plaintiff filed suit in the United States District Court for the District of New Jersey against Zenith Laboratories, Inc. and its subsidiary, Paramount Supply Corp., alleging infringement of plaintiff's patent on chlordiazepoxide. During the course of pretrial discovery in that case, plaintiff learned from officials of the defendant companies that they had begun to ship chlordiazepoxide capsules in interstate commerce. In March 1973, Zenith filed an abbreviated new drug application with the FDA on chlordiazepoxide. On February 27, 1975, plaintiff filed this action in district court. The FDA approved the new drug application submitted by Zenith Laboratories on March 7, 1975.

This action brings before the courts again the troubled administration of the New Drug Amendments of 1962 designed to strengthen the FDA's regulation of new drugs.[2] The Federal Food, Drug and Cosmetic Act of 1938, 52 Stat. 1040, provided that new drugs introduced after 1938 be subject to regulatory clearance prior to their being sold in interstate commerce and for administrative suspension of such clearance if thereafter required for public safety. Under the 1938 Act, a new drug was defined as any drug which was not generally recognized by experts as safe. The 1962 New Drug Amendments extended the definition of "new drug" to require that proof of effectiveness, as well as safety, be submitted as part of a new drug application. The term "new drug" is defined in 21 U.S.C. § 321(p) (1970) as follows:

"(1) Any drug . . . which . . . is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof . . . or

---

1. The Pharmaceutical Manufacturers Association has filed an *amicus* brief. It broadly supports the position advocated by Hoffmann-LaRoche.

2. The history of the problems in the early years of implementing these amendments is chroni-

cled in *American Public Health Assoc. v. Veneman*, 349 F.Supp. 1311 (D.D.C. 1972) and *Pharmaceutical Manufacturers Assoc. v. Finch*, 307 F.Supp. 858 (D.Del. 1970).

"(2) Any drug . . . the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions."

The 1962 New Drug Amendments changed the premarketing clearance procedures. Under the original 1938 Act, new drug applications were deemed approved within a fixed period unless the Secretary took affirmative steps to reject the application. However, the Amendments required the FDA to affirmatively express its approval of new drug applications prior to permitting the marketing of new drugs in interstate commerce.

21 U.S.C. § 355 (1970) prohibits the introduction or delivery for introduction into interstate commerce of any new drug unless approval of an application is effective with respect to such drug. It further provides a scheme for the processing and approval of new drug applications. The required contents of a new drug application are specified. 21 U.S.C. § 355(b) (1970). The FDA is required to approve the application within 180 days or give the applicant notice of an opportunity for hearing. 21 U.S.C. § 355(c) (1970). After giving notice and opportunity for hearing, the FDA is required to either issue an order refusing to approve the application or issue an order approving the application. 21 U.S.C. § 355(d) (1970). Condemnation action may be instituted to seize drugs introduced into interstate commerce without section 355 approval. See, 21 U.S.C. §§ 331, 334 (1970). See also, 21 U.S.C. § 332 (1970).

The crux of this controversy is the use by the FDA of the new drug application procedure as a sort of administrative holding action to regulate the sale and manufacture of "me-too" drugs. Me-too drugs are drugs which are chemically equivalent to a pioneer drug for which a full new drug application is in effect. It is estimated that five to thirteen me-too drugs exist for every new drug that has a FDA approved new drug application. It is the present policy of the FDA, termed an interim policy, to require the filing of an abbreviated new drug application by the manufacturers of each me-too drug where the pioneer drug has a full new drug application approved pursuant to 21 U.S.C. § 355 (1970).[3] The FDA's position is that marketing of these drugs may be permitted without the approval of each individual new drug application.

The FDA advances two principal arguments to justify its policy. First, it claims that its compliance resources are limited and must be concentrated primarily in those areas where a potential health problem exists. Thus, the FDA has directed its compliance activities toward those drug products which have been found ineffective rather than toward those which have been found effective.[4] Second, for those drugs that the NAS/NRC have found effective and are widely recognized as safe and effective and no bioavailability[5] or special manufacturing problem is known or suspected, the need to police their distribution is minimal. Additionally, the FDA claims that it would have a difficult time in court contending that a specific version is a new

---

3. Proposed regulations published by the FDA in the Federal Register of June 20, 1975, if adopted in final form, will modify this policy. 40 Fed.Reg. 26142 (1975).

4. Drug efficacy study groups of the National Academy of Sciences and the National Research Council under contract with the FDA reviewed the effectiveness claims for every drug cleared for marketing before the passage of the 1962 amendments. Their findings were the basis for the FDA's determination whether or not substantial evidence, of effectiveness as defined in 21 U.S.C. § 355(d) (1970), had been proven. See Weinberger v. Hynson, Westcott & Dunning, 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); American Public Health Assoc. v. Veneman, 349 F.Supp. 1311, 1313–14 (D.D.C. 1972).

5. "Bioavailability" means the rate or extent to which the active ingredient in a drug becomes available to the site of drug action in the human body. See 40 Fed.Reg. 26161 (1975).

drug within the meaning of 21 U.S.C. § 321(p) (1970).

On the contrary, Hoffmann-LaRoche argues that the FDA's action is another example of its failure to follow the 1962 New Drug Amendments. Like the situation condemned in *American Public Health Assoc. v. Veneman, supra,* the FDA is again acting contrary to the clear statutory directives of section 355. Plaintiff contends that the plain meaning of section 355 dictates that once the FDA requires a new drug application to be filed, then the approval process must be completed before such drug can be marketed. *See, Virginia March v. United States,* 165 U.S.App.D.C. 267, 506 F.2d 1306, 1313–14 (1974); *American Public Health Assoc. v. Veneman,* 349 F.Supp. 1311, 1316 (D.D.C. 1972). It argues that the Congressionally expressed interest in public health and safety mandates no other choice. See, S.Rep. No. 1744, 87th Cong., 2d Sess., pt. 2, 36 (1962), U.S. Code Cong. & Admin. News 1962, p. 2884. Further, it claims that the deposition testimony of Dr. Marvin Seife, FDA's Director, Division of Generic Drug Monographs, demonstrates that no undue administrative burdens would be imposed by such a requirement.

To understand how the present state of affairs has arisen, it is necessary to chronicle some of the administrative actions taken in the implementation of the 1962 amendments with respect to me-too drugs. On January 24, 1968, at a government industry conference, the FDA announced that it would apply the applicable effectiveness findings from the National Academy of Sciences-Natural Research Council studies to all drugs, identical, related, or similar drug products. All opinions previously given to the effect that a drug was no longer a new drug were revoked in regulations published on May 18, 1968. 33 Fed.Reg. 7758 (1968). That same day a proposed procedure to determine by rule making those drugs for which a full or abbreviated new drug application would no longer be required was published. 33 Fed.Reg. 7762 (1968). These regulations were not promulgated in final form. Thus in 1968, virtually all human prescription drugs were regarded as new drugs. Regulations governing the filing and content of abbreviated new drug applications were adopted in February 1969. 34 Fed.Reg. 2673 (1969). They provide that an abbreviated new drug application need not contain safety and effectiveness data, except for those drugs for which a drug efficacy study implementation notice, previously published in the Federal Register, requires submission of clinical data adequate to assure the bioavailability of each drug product.

On July 14, 1970, the FDA issued a general notice establishing uniform conditions for the marketing of drugs covered by a drug efficacy study implementation notice. 35 Fed.Reg. 11273 (1970). This notice is of central importance to the FDA's view of this litigation. Essentially, it provides that any person who does not hold an approved new drug application and who distributes or intends to distribute a drug covered by a drug efficacy study implementation notice must submit a full or abbreviated new drug application. The notice does not explicitly state that a me-too drug could be marketed prior to approval of an abbreviated or full new drug application. It was implicit, the FDA argues, that such marketing would be permitted. To hold otherwise would be to give an unfair competitive advantage to manufacturers of identical, related or similar drug products marketed prior to a drug efficacy notice by allowing them to remain on the market pending approval of an abbreviated new drug application. Competitors' products would be kept off the market until approval was granted. Of particular importance to this case, by Federal Register notice on July 11, 1972, the FDA declared all compounds containing chlordiazepoxide subject to new drug application requirements. Abbreviated new drug applications were required to be submitted. 37 Fed. Reg. 13562 (1972).

On June 18, 1973, the Supreme Court decided four cases interpreting the 1962 amendments. *See, Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *Ciba*

Corp. v. Weinberger, 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973); Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); USV Pharmaceutical Corp. v. Weinberger, 412 U.S. 655, 93 S.Ct. 2498, 37 L.Ed.2d 244 (1973). These cases sustained the FDA's application of all drug efficacy study implementation notices to me-too drug products and upheld the agency's primary jurisdiction to determine the status of drugs under the Act.

■ Preliminarily, the FDA suggests that Count One of plaintiff's complaint is moot because the FDA approved the new drug application of Zenith Labs on March 7, 1975, during the pendency of this litigation. Count One challenges the FDA's policy as violative of 21 U.S.C. § 355 (1970). This general policy continues in operation with respect to whole generic classes of drugs. Voluntary cessation of the alleged wrongful conduct in one instance, while it continues in all other areas, has not conveniently mooted this portion of plaintiff's complaint. United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 202–204, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968); Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 511, 31 S.Ct. 279, 55 L.Ed. 310 (1911); Cf. Preiser v. Newkirk, 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975); National Broadcasting Co., Inc. v. FCC, 170 U.S.App. D.C. 173, 516 F.2d 1101 (1975).

■ Reaching the merits of plaintiff's statutory argument, the Court holds that the FDA's policy of permitting new drugs to be marketed without an approved new drug application contravenes the clear statutory requirement of preclearance mandated by 21 U.S.C. § 355 (1970). The FDA's choice of policy is not within the intendment of the 1962 New Drug Amendments and the legislative scheme they embody. American Public Health Assoc. v. Veneman, 349 F.Supp. 1311 (D.D.C.1972).

■ Further, the action of the FDA in permitting such marketing of large classes

of me-too drugs violates its own regulations. See, 21 C.F.R. §§ 314.1(a)(f), 314.012 (1974); Nader v. Nuclear Regulatory Commission, 168 U.S.App.D.C. 255, 513 F.2d 1045, 1051 (1975); Borough of Lansdale v. FPC, 161 U.S.App.D.C. 185, 494 F.2d 1104, 1113 & n.42 (1974). The implication that the FDA seeks to find in the language of the July 14, 1970 notice is an impermissible one. The Court recognizes that the FDA is to be given the administrative flexibility to make regulations and to determine the new drug status of individual drugs or classes of drugs. See, Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645, 653, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); National Nutritional Foods Ass'n v. Weinberger, 512 F.2d 688, 696–98 (2d Cir. 1975). Certainly it has the power to promulgate regulations that adopt a monograph procedure for human prescription drugs similar to that adopted for over-the-counter drugs whereby a drug or drugs may be declared to be no longer new drugs. See, 21 C.F.R. § 330.10 (1974). The FDA can regulate the bioequivalence and special manufacturing problems through its general rule-making power, 21 U.S.C. § 371 (1970). However, the argument that the FDA lacks the administrative resources to insure compliance with section 355 cannot be permitted to postpone to some indefinite future date the implementation of the required preclearance approval of new drug applications. See, Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971).

The Court gives particular weight to the fact that the amicus curiae is the Pharmaceutical Manufacturers Association whose members numerically would favor me-too companies, but said Association calls attention to the dangers inherent in releasing untested me-toos for ingestion by the general public.

Summary judgment will therefore be entered for the plaintiff.[6] Defendants will be

---

**6.** Whatever the anticompetitive effects and secondary patent protection judgment for plaintiff

will give to manufacturers with approved new drug applications, the overriding interest in in-

permanently enjoined from implementing its policy which permits the introduction into interstate commerce without an approved new drug application of prescription drugs which the FDA has previously declared to be new drugs within the meaning of 21 U.S.C. § 321(p) (1970).[7]

suring the health and safety of the public through compliance with section 355 requires the result reached here.

**7.** Since plaintiff's statutory argument is dispositive, it is unnecessary to consider plaintiff's

claim that defendants have violated 5 U.S.C. § 553 (1970) in adopting their policy without notice or opportunity for comment.