UNITED STATES of America

v.

ARTICLES OF DRUG, etc.

Appeal of the LANNETT COMPANY, INC.

No. 77–2100.

United States Court of Appeals, Third Circuit.

Argued May 4, 1978.

Decided Aug. 14, 1978.

As Amended Dec. 1, 1978.

Jacob Laufer, Milton A. Bass, Sheldon S. Lustigman, Bass, Ullman & Lustigman, New York City, for appellant.

Alexander Ewing, Jr., Asst. U. S. Atty., Philadelphia, Pa., Stephen R. McSpadden, U. S. Dept. of Justice, Consumer Affairs Section, Washington, D. C., Harry Shulman, Food and Drug Administration, Rockville, Md., for appellee.

Before ADAMS, ROSENN and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

On August 11, 1976, the United States filed a complaint in the district court for the Eastern District of Pennsylvania seeking condemnation and destruction of certain articles of drugs manufactured and owned by the Lannett Company, Inc. ("Lannett" or "claimant"). The Government alleged that the drugs were subject to seizure under the Food, Drug and Cosmetic Act ("Drug Act"), 52 Stat. 1052 (1938), *codified as amended* at, 21 U.S.C. §§ 301–92 (1976), because they were "misbranded"; that is, their labels did not contain adequate instructions for lay use. Essentially, the Government asserted: (1) that the seized articles were all prescription drugs not generally recognized as safe and effective; (2) that as such, they were "new drugs"; and (3) that as "new drugs" they could not be labeled satisfactorily for lay use without the approval of a New Drug Application ("NDA") by the Food and Drug Administration ("FDA"). On this theory, the

Government moved for summary judgment in the district court, and the motion was granted. Because we believe that the district court incorrectly decided that motion, we reverse.

## I.

Federal regulation of the drug industry may be traced to the passage of the Pure Food and Drug Act of 1906 [1] in which Congress required the producers of drugs to list the quantity and nature of potent ingredients in their products and to refrain from labeling their products with false of misleading statements. Some safety requirements were imposed on drug manufacturers under this legislation as well, but the statute contained no provisions to ensure the effectiveness of drug products.

In 1938, the present Drug Act was introduced and more stringent controls governing the demonstration of a drug's safety were imposed on drug manufacturers. Under the Act, FDA approval was required for all drugs not generally recognized as safe for human consumption. Such "new drugs" could not be sold by any company until it had received premarketing clearance by the

FDA; only established, generally recognized drug products could bypass the approval mechanism. The legislation, however, provided only limited "effectiveness" provisions.[2]

Lannett applied for and received marketing clearance, under the 1938 Act, for several of its articles of drugs, including those seized in the instant case.[3] Approval, certified that the FDA regarded Lannett's products as safe for human consumption and with such FDA certification, Lannett was able to market its drugs. By 1962, Lannett's products were sold to and widely used in the medical profession.

In 1962, however, the Drug Act was amended and the statutory definition of "new drug" was broadened to add greater protection for the consuming public. Under the new standards, a drug would be treated as a "new drug," subject to premarketing clearance, if "not generally recognized . . . as safe *and* effective" for the purposes for which the drug was being marketed. 21 U.S.C. § 321(p)(1) (1976) (emphasis supplied).[4] The new effectiveness requirement

1. Federal Food and Drugs Act of 1906, ch. 3915, § 1, 34 Stat. 768 (1906) (repealed 1938).

2. Drug efficacy review under the 1938 act was quite limited and confined to situations in which "the drug's potential effectiveness was inextricably linked with that of its safety. Where potential benefits from the use of a drug were outweighed by the risk entailed in its use, the FDA could refuse permission to market the drug." Comment, *Picking Your Poison: The Drug Efficacy Requirement and the Right of Privacy*, 25 U.C.L.A.L.Rev. 577, 581 (1978).

3. Twelve drug products of differing dosage and form were seized from the Lannett plant. These drugs may be classified as follows: (1) *anti-arrhythmic drugs*, (a) Procainamide Hydrochloride Capsules, U.S.P. (United States Pharmacopeia), 250 mgs and 500 mgs, (b) Quinidine Sulfate Tablets, U.S.P., 200 mgs; (2) *anti-convulsive drugs*, (a) Primidone Tablets, 200 mgs; (3) *thiazide drugs*, (a) Chlorothiazide, U.S.P., 250 mgs and 500 mgs, (b) Hydrochlorthiazide, U.S.P., 25 mgs and 50 mgs, (c) Trichlormethiazide Tablets, 4 mgs; (4) *short-acting system sulfonamides*, (a) Sulfadiazene Tablets, U.S.P., 0.5 gr., (b) Sulfisoxazole Tablets, U.S.P., 0.5 gr., (c) Trisulfapyrimidines Oral Suspension, U.S.P.; (5) *anti-tuberculosis agent*, (a) Amino Salicylic Acid, U.S.P., 0.5 gr., (b) Sodium Aminosalicylate, U.S.P., 0.5 gr.; and (6)

*carbonic anhydrase inhibitor*, (a) Acetazolamide Tablets, U.S.P., 250 mg. Lannett asserts that its drugs had been sold for over twenty-five years without a complaint and that some 46 million doses of the drugs had been administered safely. Moreover, Lannett asserts that each drug was accepted by the medical profession as a safe and effective drug.

4. 21 U.S.C. § 321 (1976) provides in pertinent part that

(p) The term "new drug" means—
(1) *Any drug . . . the composition of which is* such that such drug is *not generally recognized*, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, *as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof . . .*; or
(2) Any drug . . . the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions.
*Id.* § 321(p)(1)–(2) (emphasis supplied).

of the 1962 legislation was made retroactive to all drugs which had been the subject of new drug applications under the 1938 statute. Thus, it applied to all drugs which previously had secured FDA premarketing approvals—as those received by Lannett for the drugs seized in this case.

The FDA, recognizing that a transitional period would be necessary to review all drug products affected by the 1962 amendments, granted a two-year grace period before revoking any NDAs given under the 1938 Act. This period of time was to be used to assess the evidence of "effectiveness" of approved drug products. Two years proved to be insufficient time to permit the FDA to evaluate the status of all drugs potentially made "new drugs" by the 1962 amendments. Therefore, in order to expedite the task of evaluation, the FDA arranged with the National Academy of Sciences—National Research Council ("NAS–NRC") to have them review the qualities of the potential "new drugs."

NAS–NRC undertook a study of some 4,000 drug formulations for the express purpose of assessing the efficiency of the product. This study, known as the Drug Efficiency Study, was submitted to the FDA for evaluation; the FDA retained authority to accept or reject the findings of NAS–NRC. As a result of the NAS–NRC findings, the FDA set forth in the Federal Register its conclusions and assessment ("Drug Efficiency Study Implementation" or "DESI" notices) of whether a particular drug could be considered "effective" for use as required by the 1962 amendments to the Drug Act.

Each of the drugs confiscated in this action, at least in its generic form, was included in the DESI notices. It is conceded that

NAS–NRC and the FDA found every one of the claimant's drugs, in its generic form, to be effective for the purposes that Lannett was selling them. Nonetheless, because of possible variations in the manufacturing process used by each individual drug producer, FDA classified all of the drugs tested as "new drugs," requiring each producer of the tested drug to file for marketing clearance. In recognition of NAS–NRC's positive effectiveness evaluation of the drugs, however, the FDA requested that manufacturers file only an Abbreviated New Drug Application ("ANDA"), a short form, requiring proof that the individual manufacturing process for a particular drug yielded an effective product. Filing for an ANDA was intended to ensure that each version of a generic drug would match the generic compound certified as effective in the DESI notice.[5] In response to the FDA requirements, Lannett filed ANDAs for each of the drug products seized in this action.

Although the generic equivalents of Lannett's drugs were certified as effective for the purposes indicated by Lannett, each of the drugs was also found not to be recognized as effective for other purposes indicated by different manufacturers. As to the indications for which a drug was not found to be effective, the FDA declared the drugs to be "new drugs" and required manufacturers of the drug for those indications to file an NDA. The FDA further announced that it would give a hearing to any person affected adversely by the withdrawal of the approved drug status for any specific indication of a drug. Lannett could not have qualified for such a hearing, as its drugs were being marketed only for indications approved by the FDA.

5. FDA notices in the Federal Register called upon manufacturers to submit ANDAs which included adequate data to assure the biologic availability of the drug in the particular manufacturer's formulation. Bioavailability of a drug relates to "the rate and extent to which the active drug ingredient or therapeutic moiety is absorbed from a drug product and becomes available at the site of drug action." 21 C.F.R. § 320.1(a) (1977). Bioavailability considerations test whether a given drug product is produced and manufactured in a manner as to ensure that the active generic ingredient of the drug will be delivered to the site of the body which the drug is supposed to affect.

Related to bioavailability is bioequivalence—that is, the rate and extent of absorption of the active ingredient of a given drug product compared to its generic equivalent. Data on individual drug producer's methods of manufacture and information concerning bioavailability help in determining bioequivalence.

During the pendency of Lannett's ANDA application, the FDA allowed it to continue to market its drugs. Under FDA policy, Lannett could continue to manufacture and sell its drug products so long as it attempted to secure an approval of its application. In 1975, however, in response to a district court opinion,[6] the FDA altered its marketing policy and ordered that marketing of "new drugs" cease until they were approved by the FDA.[7] Lannett nonetheless continued to market its drugs with pending ANDAs. Not until April of 1976 did the FDA order Lannett to cease the marketing of its drugs. At that time, the FDA informed Lannett that its drugs were unapproved "new drugs" which could not be marketed legally. Lannett responded to the FDA notice and asserted that it had applications for approval pending and that it needed continued marketing of the drugs pending approval for economic reasons. FDA did not respond to Lannett's letter and some four months later, it brought this action to condemn and destroy the seized articles of drugs.

## II.

In its complaint, the Government asked for the seizure of Lannett's drugs—all of which are prescription drugs—alleging that they were misbranded under 21 U.S.C. § 352 (1976) which provides, in pertinent part, that:

A drug or device shall be deemed to be misbranded—

(f) *Directions for use and warnings on label*

Unless its labeling bears (1) adequate directions for use; . . . *Provided,* That where any requirement of clause (1) of this subsection, as applied to any drug or device, is not necessary for the protec-

tion of the public health, the Secretary shall promulgate regulations exempting such drug or device from such requirement.

21 U.S.C. § 352(f)(1) (1976).

Adequate directions for use "means directions under which the layman can use a drug safely and for the purposes for which it is intended," 21 C.F.R. § 201.5 (1977). In its complaint the Government argued that Lannett's drugs, as prescription drugs, by their very nature could not be used to inform the layman. Therefore, the Government contended that unless the drugs were exempt from the "adequate directions" requirement, they would be misbranded.

FDA regulations provide that a prescription drug for human consumption shall be exempt from the requirement that it bear adequate instructions for lay use if either (a) it is an "old drug"—generally recognized as safe and effective or (b) it is a "new drug" the labeling of which is authorized by an approved NDA. 21 C.F.R. § 201.-100(c)(2) (1977); *see* 21 C.F.R. § 201.115 (1977).

The Government contended that all of Lannett's drugs were "new drugs" which had not received approval by the FDA. Therefore, the Government claimed that the drugs could not be exempt from the "adequate directions" requirement of section 352(f)(1) and that they were misbranded. Consequently, FDA asked that the drugs be condemned under 21 U.S.C. § 334(a)(1) (1976) as articles held for sale in interstate commerce, the components of which had been shipped in commerce.[8]

Lannett's answer denied that the drugs were misbranded and subject to seizure. The claimant instead stated that its drugs were generally recognized as safe and effective and that therefore they were not "new drugs." It asked that the libel be dismissed.

---

**6.** *Hoffmann-LaRoche v. Weinberger,* 425 F.Supp. 890 (D. D.C. 1975).

**7.** *See* 40 Fed.Reg. 43531–33 (Sept. 22, 1975).

**8.** Section 334 provides in pertinent part that (1) Any article of . . . drug . . . that is adulterated or misbranded when introduced into or *while held for sale* (whether or not the first sale) *after shipment in interstate*

commerce . . . shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court of the United States . . . within the jurisdiction of which the article is found . . . . 21 U.S.C. §§ 334(a)(1) (1976) (emphasis supplied).

After receipt of the answer, the Government moved for summary judgment, filing affidavits to the effect that regardless of the general recognition of safety and effectiveness of generic versions of Lannett's drugs, Lannett's drugs were "new drugs" in the absence of proof of the bioavailability and bioequivalence of the products. The Government also argued that Lannett be precluded from attacking the FDA's "new drugs" assessment because the claimant's filing of ANDAs for the drugs without challenging FDA's classification of the products constituted a waiver. Lannett filed an affidavit asserting the general recognition of the safety and effectiveness of generic equivalents of its products and asserting that bioavailability and bioequivalence are not relevant as to whether a drug is a "new drug." Its affidavit also asserted that all of the seized drugs contained adequate instructions for lay use and hence could not be misbranded. Finally, Lannett contended that it was never given an opportunity to challenge the FDA's "new drug" determinations and that therefore, it was not precluded from litigating that issue.

With this background, on May 16, 1977, the district court granted the Government's motion for summary judgment, holding that although the claimant's affidavit recited facts contradicting those in the plaintiff's affidavit, the contents of Lannett's affidavit did not rise "to the level of raising disputed questions of fact." The basis for the court's decision, however, was unclear. It made no findings of fact as to the manner by which the articles of drugs were misbranded, nor did it hold that the articles were "new drugs." Rather, the court outlined general principles of law [9] and held only that Lannett could not bypass agency review and relitigate the FDA's decision that the seized drugs were "new drugs" within the meaning of the Drug Act.

### III.

The basis for the district court's decision to condemn Lannett's drugs was that Lannett's sole defense, that its products were not "new drugs," was precluded by its failure to challenge administratively FDA's classification of the drugs. The court stated that allowing Lannett to challenge the FDA's "new drug" classification in an action in the district court would be "tantamount to permitting a by-pass of the review provided in the [Drug] Act and allowing relitigation in another proceeding." This, the court asserted, would have run afoul of the Supreme Court's admonition in *Ciba Corp. v. Weinberger*, 412 U.S. 640, 644, 93 S.Ct. 2495, 2498, 37 L.Ed.2d 230 (1973), that

> [W]here there is . . . an administrative determination, whether it be explicit or implicit in the withdrawal of an NDA, the tactic of "reserving" the threshold question (the jurisdictional issue) for later judicial determination is not tolerable. There is judicial review of FDA's ruling. But petitioner, having an opportunity to litigate the "new drug"

---

**9.** The court stated the following general propositions of law without explaining their relevance to the instance case:

(1) A drug may be a "new drug" within the meaning of the Drug Act no matter how long a period of time it has been available, *United States v. Allan Drug Co.*, 357 F.2d 713 (10th Cir.), *cert. denied*, 385 U.S. 899, 87 S.Ct. 203, 17 L.Ed.2d 131 (1966);

(2) The Government need not prove that seized articles are in fact unsafe or ineffective, only that they are not recognized generally as such by qualified experts, *Amp, Inc. v. Gardner*, 389 F.Supp. 825, 831 (2d Cir.), *cert. denied*, 393 U.S. 825, 89 S.Ct. 86, 21 L.Ed.2d 95 (1968); *United States v. An Article of Drug . . . "Mykocert,"* 345 F.Supp. 571, 574 (N.D. Ill. 1972);

(3) Substantial evidence of general recognition of effectiveness is required before an NDA will issue and in the absence of such evidence, the drug would be a "new drug" under the Drug Act, *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 629, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973);

(4) The FDA has power to determine if an NDA is required prior to marketing, *id.* at 642, 93 S.Ct. 2469; and

(5) Where a claimant has had an opportunity to litigate the "new drug" issue before the FDA, it may not relitigate that issue in another proceeding. *Ciba Corp. v. Weinberger*, 412 U.S. 640, 644, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973).

issue before the FDA and to raise the issue on appeal to a court of appeals, may not relitigate the issue in another proceeding. *Yakus v. United States,* 321 U.S. 414, 444–446 [64 S.Ct. 660, 88 L.Ed. 834].

Lannett contends that the district court's reliance on *Ciba* was misplaced because: (1) Lannett was never given an actual hearing in which it could contest the status of the drugs; (2) at the time the drugs were classified as new, the FDA indicated that the drugs were considered safe and effective for all indications under which Lannett was selling the drugs; (3) at the time the drugs were reclassified, the FDA permitted their continued marketing subject only to an ANDA covering Lannett's specific manufacturing process; (4) not until April of 1976 was Lannett fully apprised that it was in danger of losing its drugs; and (5) within four months of the notice from the FDA this suit was commenced. Lannett therefore asserts that this suit was the first opportunity for it to litigate the "new drug" issue and the first time in which that status affected it adversely.

FDA concedes that Lannett could not have qualified for a hearing under its regulations and that Lannett could not have litigated "new drug" status before any court of appeals.[10] It asserts, nonetheless, that whenever FDA issued each declaration of "new drug" status, Lannett could have challenged such declaration in the district court or by petition or letter to the agency. FDA contends that the instant it classified Lannett's drugs as new and required an ANDA, Lannett was aggrieved and could have challenged the decision and that therefore, the district court should be affirmed.

■ We believe that the FDA and the district court have given undue deference to the agency and have in essence precluded Lannett from challenging the status of its products. It is undoubtedly true that Lannett could have written the FDA and requested that its drugs not be classified as new. However, it is equally certain that there was no reason for Lannett to do so because it was not affected adversely by the "new drug" classification. Until 1975, it legally sold its drugs,[11] and even after FDA decided to withdraw marketing approval, Lannett was not affected until it received a letter from FDA notifying it to cease marketing. Under those circumstances, we believe it error for the district court to have precluded Lannett from challenging "new drug" status. We therefore must reverse.[12]

## IV.

Although we hold that this case must be reversed because the district court erroneously precluded Lannett from litigating the

---

**10.** The FDA had provided an opportunity for a hearing to "any person who would be adversely affected" by its order requiring deletion of claims of certain indications of drugs. Lannett was not such a person, for it marketed its drugs only for approved purposes. Lannett therefore could not have sought recourse in the court of appeals under 21 U.S.C. § 355(h) (1976) ("An appeal may be taken . . . from an order . . . refusing or withdrawing approval of an application . . . .") because the FDA declarations did not *withdraw or refuse* approval for any of Lannett's drugs.

**11.** The DESI notices permitted drug manufacturers to continue the marketing of their drugs pending approval by FDA of an ANDA from the manufacturer. Such continued to be the policy of FDA until the *Hoffmann-LaRoche* decision. Lannett alleges that even following that decision, FDA did not immediately enforce its decision to prevent marketing. Taking these factors together, it is apparent that Lannett was not affected adversely by the requirement that it file an ANDA until FDA attempted to enforce its *Hoffmann-LaRoche* regulations. *See* n.7, *supra.*

**12.** The district court stated that although Lannett's affidavit recited facts contrary to those of the FDA, the court did not "think that the contents of the . . . affidavit" rose to "the level of raising disputed questions of fact." FDA asserts that this was a holding by the court that Lannett's drugs were in fact "new drugs" and that therefore they were misbranded. The court, however, made no findings of fact or conclusions of law on that point and we do not believe that the language quoted above is sufficient to withstand appellate scrutiny. Reversal is warranted solely because of the district court's erroneous preclusion of litigation of the "new drug" issue.

"new drug" status of its products, we feel compelled to address the critical issues the district court will face on remand as well, for we may lend guidance to prevent another appeal. We therefore briefly address the following critical questions: (A) are there issues of fact pertaining to the "new drug" status of Lannett's products precluding summary judgment? and (B) even if the drugs are new, may they be condemned or destroyed?

### (A)

A new drug is "[a]ny drug . . . that . . . is not generally recognized [by qualified experts] as safe and effective" for uses suggested by its labeling. 21 U.S.C. § 321(p)(1) (1976). Under the statute, such a "new drug" cannot be marketed without prior approval by the FDA.[13] No doubt exists that the FDA has listed Lannett's drugs as "new drugs" within the Drug Act; similarly, no doubt exists that at the time of the condemnation, none of Lannett's ANDAs was approved.[14] What is at issue, in view of the FDA's concession that certain generic drugs almost identical to Lannett's are generally recognized as safe and effective, is whether Lannett's drugs may be considered "new drugs"?

The FDA admits that data exists from which experts have concluded that certain generic formulations of Lannett's products are safe and effective for human consumption. But, the Government asserts that these judgments may not be applied directly to Lannett because there is no sound basis to extrapolate judgments of one manufacturer's drugs to another's products. The FDA instead maintains that for each specific drug product there must be general recognition of its safety and efficacy. This, the FDA contends, is especially true if applied to the bioavailability (ability of the active ingredient of a drug to get to the bloodstream), the bioequivalence (comparison of one drug to another), and the quality control problems of specific drugs such as Lannett's.

In contrast to the FDA's new drug theory is that espoused by Lannett. Lannett's basic contention is that all of its drugs have been admitted by the Government as being the same generically as a drug already approved as safe and effective. Therefore, it contends that all that is required by the "new drug" section—*general* safety and effectiveness recognition—has been provided and that bioavailability, bioequivalence, and other quality control tests are irrelevant as to safety and efficacy. Lannett points to other provisions of the Drug Act and the regulations which the FDA can utilize to sanction a manufacturer for a drug which does not perform according to specifications for the generic drug,[15] and from this, rea-

---

**13.** The Drug Act provides in pertinent part that

(a) *Necessity of effective approval of application*

No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application pursuant to subsection (b) of this section is effective with respect to such drug.

(b) *Filing application; contents*

Any person may file . . . an application with respect to any drug subject to the provisions of subsection (a) of this section. Such person shall submit to the Secretary as part of the application (1) full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use; (2) a full list of the articles used as components of such drug; (3) a full statement of the composition of such drug; (4) a full description of the methods used in, and the facilities and controls used for, the manufacture, pro-

cessing, and packing of such drug; (5) such samples of such drug and of the articles used as components thereof as the Secretary may require; and (6) specimens of the labeling proposed to be used for such drug.

21 U.S.C. § 355(a) & (b) (1976).

**14.** Some time after the complaint in this action was filed, but before the district court acted on the Government's motion for summary judgment, two of Lannett's twelve seized articles received approval by the FDA. The district court ordered the destruction of the products, nonetheless. We address the propriety of that decision in n.21, *infra*, especially in view of the Government's representation that at this time all but five of Lannett's drug products have been approved.

**15.** The Drug Act provides sanctions to be levied against the manufacturer of a drug purporting to be of the same quality as recognized by an official compendium for drugs. "A drug or

sons that FDA is not authorized to take a specific manufacturer's methods of production into account when assessing "newness."

■ We believe Lannett's position to be correct. FDA's own regulations as to the definition of "newness" of a drug, though not purporting to be exhaustive, conspicuously omit any reference to anything like quality control or a specific product's capabilities:

(h) The newness of a drug may arise by reason (among other reasons) of:

(1) The newness for drug use of any substance which composes such drug, in whole or in part, whether it be an active substance or a menstruum, excipient, carrier, coating, or other component.

(2) The newness for a drug use of a combination of two or more substances none of which is a new drug.

(3) The newness for drug use of the proportion of a substance in a combination, even though such combination containing such substance in other proportion is not a new drug.

(4) The newness of use of such drug in diagnosing, curing, mitigating, treating, or preventing a disease, or to affect a structure or function of the body, even though such drug is not a new drug when used in another disease or to affect another structure or function of the body.

(5) The newness of a dosage, or method or duration of administration or application, or other condition of use prescribed, recommended, or suggested in the labeling of such drug even though such drug when used in other dosage, or other method or duration of administration or

application, or different condition, is not a new drug.
21 C.F.R. § 310.3(h)(1)–(5) (1977).

■ A close reading of the FDA's "new drug" regulation indicates that newness is a function of the novelty of a particular formulation, including a novel composition, combination, dosage, or administration. It extends so far as to encompass new uses for a drug or new methods of application, but nothing within the regulation indicates a scope as broad as that advocated by FDA. The absence of any regulatory provision setting forth a manufacturer's production techniques as an element making a formulation "new" is powerful evidence that FDA's theory is not based strongly on the statute. In fact, if the FDA's theory were supported by the Drug Act, its "newness" regulation would be superfluous for under the FDA's theory any new manufacture of a generic drug, whether approved or not, would be a "new drug" in the absence of general recognition of the safety and effectiveness of the new manufacture. The absence of such a provision in the regulations undercuts FDA's position.

The cases lend additional support to the conclusion that there is no need for general recognition of each manufacturer's particular production techniques. In *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973), the Supreme Court, in deciding that the FDA had rule-making power to declare a generic compound a "new drug," also confirmed the FDA's power to make that declaration applicable to all "me-too" drugs—those purporting to be the same as the generic formulation. 412 U.S. at 625, 93 S.Ct. at 2469. This, the court indicated, was for the purpose of ensuring administrative efficiency because "paralysis would re-

---

device shall be deemed adulterated . . . [i]f it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. . . ." 21 U.S.C. § 351(b) (1976).

Lannett's drugs are asserted to be of the same quality and strength as generic formulations recognized by the United States Pharma-

copeia—an official compendium. *See* n.3, *supra*. Thus, problems with quality control, bioequivalence, or bioavailability of its drugs could easily be handled through the adulteration provisions of the Drug Act. Because the Act contains these provisions to deal with an individual manufacturer's version of a generic drug, Lannett reasons that there is no necessity to make individual manufacturing idiosyncracies part of the "new drug" tests.

sult if case-by-case battles in the courts were the only way to protect the public." *Id.* at 626, 93 S.Ct. at 2481. Moreover, the Court indicated that a case-by-case approach could result in inequities, allowing one manufacturer to market its goods while another was litigating with the FDA. *Id.* Although concerned with *eliminating* harmful drugs from public sale and not *permitting* drugs to be marketed, the Court's reasoning is supportive of Lannett's position—"me-too" drugs carry the same qualities as generic drugs, irrespective of individual manufacturing differences, and therefore should be treated the same for purposes of the Drug Act.

Similarly, *United States v. An Article of Drug . . . "Mykocert"*, 345 F.Supp. 571 (N.D.Ill.1972), supports Lannett's assertion that its drugs may escape "new drug" classification if they are generally recognized as containing the same characteristics as generic drugs. In that condemnation case, the claimant defended seizure asserting that its drugs were not "new." The court stated that

> Claimant's contention that Mykocert is not a new drug can only succeed if it is recognized by experts in the field as safe and effective. There are two possible alternatives that would substantiate claimant's assertions. *Either a Mykocert type drug in its exact form, dosage, and*

*application must be recognized by experts (even though the drug may be marketed under a different name)* [a generic drug] or each of the component parts of Mykocert must be recognized with the critical caveat that the combination of these parts does not in any way create a new drug under [FDA regulations].

345 F.Supp. at 575 (emphasis supplied).

Although the *Mykocert* court concluded that its claimant could not make out such a claim, the court accepted a definition of new drugs nearly identical with that proposed by Lannett. If that holding is coupled with the Supreme Court's indication of similar qualities between "me-too" drugs, and the Government's concession that Lannett's drugs were identical to approved drugs but for the individual manufacturing techniques, there should be little to support summary judgment for the Government on the "new drug" issue, as a matter of law.[16]

### (B)

■ Even if the articles of drugs seized in the instant case are deemed "new drugs" we have serious doubts whether the drugs should be destroyed. The Government's basic theory for condemnation is that the seized prescription drugs, as "new drugs" cannot be labeled properly for lay use and thus are misbranded.[17] Even accepting this

---

16. The parties have also cited two other cases to support their positions, *United States v. Articles of Drug . . . Colchicine*, No. 76–C–2444 (S.D.N.Y. Jan. 11, 1978), and *United States v. An Article of Drug . . . Excedrin P.M.*, No. 70–C–77 (E.D.N.Y. March 5, 1971). The Government contends that *Colchicine* supports its theory that manufacturing idiosyncracies are determinants of "new drug" status. In that case, the Government sought condemnation and destruction of articles of drugs alleging that they were misbranded and poorly manufactured with incorrect labeling. The Government also introduced evidence that the claimant could not show general recognition of the drug's bioavailability and other factors—an argument analogous to that presented here. The Court, however, did not rely on this theory and instead held that the drugs had been mislabeled (wrong amount of drug listed) and that the drugs were not the same as generic compounds because they differed in dosage and method of release. That case is thus distinguishable from

this in which Lannett's drugs are admittedly the same as generic compounds. *Excedrin* adds some support for Lannett, holding that affidavits by the claimant asserting that its product, as the combination of safe and effective drugs, was not a "new drug," opposed by Government affidavits asserting that they were "new drugs," raised at least a triable issue of fact. Lannett asserts that the affidavits in this case provide a similar issue for trial.

17. *See* Part II, *supra*. Lannett strongly opposes the Government's theory as incorrect. Lannett asserts that it is based on a false premise—its drugs were prescription drugs which by their very nature cannot bear adequate directions for lay use. *See United States v. An Article of Drug . . . "Mykocert"*, *supra*, 345 F.Supp. at 573. Lannett states that no FDA regulation declares that a prescription drug cannot be adequately labeled. Rather, Lannett contends that its labels conformed to general practice and contained sufficient warn-

theory of misbranding, nothing compels destruction of the drugs.

Drugs may be condemned either if they are misbranded, as alleged in this case, or if they are unapproved "new drugs." However, because different standards are used to ascertain whether a drug is subject to seizure under "misbranding" than are used under "new drugs" and because different consequences attach to the provision under which a drug is condemned, analysis of the appropriate category for condemnation is necessary.

■ In order for a court properly to condemn a drug item, a nexus must be shown between that drug item and commerce so as to invoke federal jurisdiction. On the one hand, in a case in which a drug is found to be misbranded, it may be condemned: "[1] when introduced into or [2] while in interstate commerce or [3] while held for sale (whether or not the first sale) after shipment in interstate commerce." 21 U.S.C. § 334(a)(1) (1976).[18] On the other hand, if a drug is confiscated because it is an unapproved "new drug" it must be shown to have been introduced or delivered for introduction into interstate commerce, before it may be condemned. 21 U.S.C. § 355(a) (1976).[19]

The drugs in this case were confiscated at Lannett's plant. Because the components of the drugs were shipped interstate, the drugs were subject to seizure under the third clause of section 334. Therefore, the drugs were subject to condemnation only if misbranded and could be condemned only under section 334's provisions.

If the basis for the condemnation of the drugs is that they are misbranded—as is the only possible basis for condemnation here— section 334 does not *require* the destruction of the drugs. Rather, it provides the court with discretion:

> (1) Any . . . drug . . . condemned under this section shall, after entry of the decree, be disposed of by destruction or sale as the court may, in accordance with the provisions of this section, direct . . . *Provided*, That after entry of the decree and upon the payment of the costs of such proceedings and the execution of a good and sufficient bond conditioned that such article shall not be sold or disposed of contrary to the provisions of this chapter . . .
> *the court may by order direct that such article be delivered to the owner thereof to be destroyed or brought into compliance with the provisions of this chapter*
> . . . .

21 U.S.C. § 334(d)(1) (1976) (emphasis supplied).

Thus, even if the court finds on remand that the drugs are misbranded by virtue of being "new drugs," the court should not automatically order destruction of the drugs;[20] it may consider allowing Lannett the possibility of rehabilitating that feature of the labeling leading to the drug's misbranding. Rehabilitation would be simple enough, for Lannett has ANDAs pending for each of its drugs and as each drug is approved, its label may be constructed so as to qualify for an exemption from the "adequate directions" requirement.[21]

ings for lay use. We do not resolve this conundrum in view of our belief that even if the articles of drugs are misbranded, Lannett may rehabilitate its product.

18. *See* n.8, *supra*.

19. *See* n.13, *supra*.

20. The district court ordered the destruction of Lannett's drugs after granting the Government's motion for summary judgment. It entered no findings of fact as to misbranding nor did it consider Lannett's argument that the drugs were labeled sufficiently for lay use. The court also did not consider whether Lannett

could cure its defective labeling. The court apparently viewed condemnation as automatic once it determined that the drugs were "new." This we believe is unsupportable because the drugs were not condemned as "new drugs," but were condemned as "misbranded." On remand the court should consider these factors before condemning the drugs.

21. One final point must be raised. As stated previously, *see* n.14, *supra*, since the time of this complaint, all but five of Lannett's seized drugs have received FDA approval. We perceive no compelling purpose under the Drug Act to order destruction of such approved

586

## V.

The district court's grant of summary judgment for the Government will be reversed and the action will be remanded for proceedings not inconsistent with this opinion.

drugs. In view of the punitive nature of the destruction of drugs certified by the FDA as safe and effective and the unnecessary economic loss, we believe compelling countervailing interests must be presented by the FDA before the court should order destruction of the drugs.