The B & A PIPELINE CO., Plaintiff,

v.

Steve DORNEY, d/b/a SCD Production Co., Intervenor–Plaintiff–Appellant,

v.

ENSERCH CORPORATION, d/b/a Lone Star Gas Co., The B & A Pipeline Co., and Atlantic Richfield Co., Defendants–Appellees.

Nos. 89–2119, 89–2670.

United States Court of Appeals, Fifth Circuit.

July 6, 1990.

Rehearing Denied Aug. 14, 1990.

Michael G. Carroll, Otis Carroll, Ireland, Carroll & Kelley, Tyler, Tex., for Steve Dorney.

Jack Pew, Jr., Jackson, Walker, Winstead, Cantrell & Miller, Dallas, Tex., for Enserch Corp.

Larry D. Carlson, Ronald L. Palmer, Baker & Botts, Dallas, Tex., Rex A. Nichols, Nichols, Bailey & Watson, Longview, Tex., for B & A Pipeline and Atlantic Richfield.

Before WISDOM, JOHNSON, and DUHÉ, Circuit Judges.

WISDOM, Circuit Judge:

## I

We AFFIRM the district court's grant of summary judgment but REMAND the case for appropriate modification of the court's injunction.

## II

An understanding of the case requires a detailed summation of the facts. On May 10, 1982 Henderson Clay Products (HCP) entered into a gas purchase contract with B & A Pipeline. B & A, an intrastate pipeline company in Texas, was wholly owned by HCP. The May 10 gas purchase contract provided that HCP would sell and deliver to B & A, at the maximum lawful price, natural gas produced from the leases HCP then held or later acquired within an area outlined on a map referred to in the contract as Exhibit "A".

On May 11, 1982, B & A entered into a gas purchase contract with Enserch Corporation (d/b/a Lone Star) by which B & A would sell gas to Lone Star at B & A's cost plus a transportation charge. This May 11 contract provided that B & A dedicate its "marketable interest in gas produced from the gas reserves underlying the lands and leases described in Exhibit 'B' and all of the gas produced from the lands and leases, subject to the gas purchase contracts described in Exhibit 'A' ".[1]

Both the May 10 and the May 11 contracts required the buyers (B & A and Lone Star, respectively) to take 85 percent of the delivery capacity of the wells on the contract acreage or to pay for that percentage of the delivery capacity even if the gas were not actually taken. Each contract had a ten year term.

During the period in which the May 10 and 11 contracts were being negotiated, B & A's employee, Wilhite, was negotiating with Dorney, who held leases on approximately 1190 acres in Rusk County, Texas. Dorney alleges that he and Wilhite struck a tentative agreement on the terms of a farmout agreement before May 10 and that Wilhite promised that HCP, through B & A, would market the gas from Dorney's acreage by dedicating it to B & A's upcoming contract with Lone Star. The farmout agreement, however, was not memorialized until November 4, 1982. It provided, among other things, that if HCP and its purchaser ever lowered their sale price below the maximum lawful price, Dorney had the right either to ratify the lower price or to market his gas to third parties. It also provided that, in the event of any payments made for gas not actually taken (such as

1. The same maps were attached to the May 10 and May 11 contracts.

might occur under a take-or-pay clause), Dorney would share in his proportionate part of all such payments. Dorney points to these two terms as evidence that the farmout agreement implied and the parties understood that HCP agreed to market Dorney's gas through B & A by dedicating Dorney's gas to B & A's May 11 contract with Lone Star.[2] The farmout agreement between Dorney and HCP, however, does not mention dedication, B & A, Lone Star, or the May 10 and 11 gas purchase contracts.

On April 15, 1983, HCP, B & A, and Lone Star modified the May 10 and 11 contracts to reduce the sale price to an amount less than the maximum lawful price. Dorney's approval for the reduction was secured pursuant to the farmout agreement.

Lone Star's performance under its May 11 contract with B & A began to falter as the market price of gas fell. On January 25, 1985, B & A filed suit in state court against Lone Star, seeking to recover under the take or pay provisions of the May 11 contract.

On June 1, 1985, Atlantic Richfield Company (ARCO) purchased HCP; this purchase included HCP's full ownership interest in B & A. ARCO stepped into HCP's shoes in relation to the farmout agreement and took over the handling of B & A's take-or-pay litigation against Lone Star.

Dorney filed a plea of intervention on December 27, 1985[3] claiming entitlement to what he alleged was his proportionate part of the proceeds of B & A's take-or-pay claim against Lone Star. Dorney based his claim in intervention on the fact that gas from his wells was marketed by B & A to Lone Star under the May 11 contract.

In February 1986, ARCO, B & A, and Lone Star reached a tentative settlement. That settlement was not made final until April 6, 1988. Pursuant to the settlement, B & A dismissed its claims against Lone Star in the state court action.[4] The settlement took the form of an amendment to the May 11 gas purchase contract between B & A and Lone Star and required that Lone Star buy large quantities of gas above the market price. Lone Star also agreed to transport gas for B & A, ARCO, and ARCO's affiliates at a very favorable rate.

On July 10, 1986, B & A amended its May 10 gas purchase contract with HCP in two ways to comport with the tentative settlement B & A had reached with Lone Star in February. First, the new dedication provision of the contract listed specific wells rather than outlining areas on maps, the method utilized in the initial gas purchase contracts. The defendant/appellees describe this change as a clarification rather than a modification of the wells included. The second amendment deleted B & A's take or pay obligations. Those two changes, Dorney argues, significantly reduced the value to Dorney of the May 10 HCP/B & A contract.[5]

On April 19, 1988, Dorney amended his plea of intervention adding several federal claims and including ARCO and Lone Star as parties. Although B & A's state court action against Lone Star (in which Dorney had intervened) was dismissed, ARCO then filed an action in federal court (Dallas) seeking a declaratory judgment that ARCO had no liability for any of Dorney's claims. Dorney, as intervenor in the state court action, then had the state court action reinstated. The defendants removed that state

---

2. Also as evidence of dedication, Dorney points to the fact that one of the Exhibit A maps in the May 10 and 11 contracts contained the faintly written and encircled number "1190". However, B & A employee Wilhite, who negotiated the contracts on behalf of B & A, testified that he made this notation as a reference to the acreage that he expected Dorney to farm out to HCP. Wilhite did not discuss with Lone Star what the number meant nor did he mention Dorney's acreage to Lone Star.

3. Dorney did not notify B & A or Lone Star of his intervention until the summer of 1987.

4. The state court action was dismissed on April 21, 1988.

5. In addition to the two amendments mentioned above, in the light of the January 1, 1985 deregulation of the gas industry and the abolition of a maximum lawful price, the maximum lawful price language was deleted from the HCP/B & A contract.

case to federal court (Tyler) in May 1988. It is from this (first) Tyler case that this appeal arises. In July 1988, Dorney filed a second amended complaint in that Tyler suit. The Tyler trial court granted ARCO, B & A, and Lone Star's Motion for Summary Judgment as to Dorney's claims on December 12, 1988. Dorney filed a notice of appeal on January 9, 1989.

On January 16, 1989, Dorney sued ARCO and, for the first time, also sued HCP in state court alleging that the federal summary judgment against him entitled him to cancel or rescind the farmout agreement. ARCO had the portion of this second state court action relating to ARCO (as distinct from HCP) removed to federal court (Tyler) on February 10, 1989 (thus creating the second Tyler case). Also on February 10, ARCO and B & A filed a motion for Rule 54(b) final judgment certification and an application for injunctive relief[6] to protect and effectuate the district court's December 12 grant of summary judgment in the first Tyler suit.[7]

On June 29, 1989, the district court, pursuant to Fed.R.Civ.P. 54(b), certified as final its summary judgment as to all claims and causes of action asserted by Dorney against ARCO, B & A and Lone Star in the first Tyler federal suit. That district court judgment also enjoined Dorney from filing, prosecuting, or further litigating actions in the state courts of Texas or in any other court in the United States against B & A, ARCO, and Lone Star arising out of the November 4, 1982 farmout agreement or the "May 11–12, 1982" [sic] gas purchase contracts. Dorney now appeals from the summary judgment and from the issuance of that injunction.

### III

In his second amended complaint Dorney raised three causes of action: one seeking damages for breach of contract, one seeking damages for fraud, and one seeking a declaratory judgment.

### A. THE BREACH OF CONTRACT CLAIM

█ Dorney argues that ARCO (through B & A) breached its obligations to Dorney under the May 11, 1982 Lone Star–B & A contract.[8] Dorney concedes that he is not a party to the contract, but contends that ARCO is nonetheless obligated to him under that contract because his gas was dedicated by B & A to Lone Star under the contract.[9] As Dorney acknowledges, this claim for damages can prevail only if his gas was in fact dedicated under the May 11 contract.

█ Dorney, however, stated in his deposition that he had at all times retained the right to take his gas in kind. Indeed, his operating agreement with HCP granted him the right to take his gas in kind; nothing in the farmout agreement conflicts with that grant. As the word implies, in a "dedication" contract, the seller commits the production of the well at issue to be sold to

---

6. The injunctive relief requested included injunction against relitigation of issues in the new state court proceedings.

7. Around June 15, 1989, Dorney filed a motion for leave to amend his pleadings in the Dallas federal case, requesting leave to file a first amended counterclaim to assert causes of action against ARCO arising under the farmout agreement. The court did not rule on that motion because that case was dismissed, pursuant to Fed.R.Civ.P. 41(a)(1)(ii), on August 8, 1989.

8. On appeal Dorney appears to be arguing a breach of contract claim under the May 10 contract as well as the May 11 contract. We cannot consider any breach claim under the May 10 contract because the only contract under which Dorney alleged a breach in the district court was the May 11 contract.

9. As an additional part of his breach of contract claim, Dorney argues that "[b]ecause of the unique position which ARCO occupied under the farmout agreement and successive gas purchase contracts, ... ARCO owed [Dorney] the highest duty of fair dealing and good faith [and] ARCO has breached this duty by wholly failing to deal fairly and in good faith to protect Dorney's interest". The district court correctly stated that, as a matter of law, ARCO did not owe Dorney "the highest duty of fair dealing and good faith". *See Texas Oil and Gas Corp. v. Hagen*, 31 Tex.Sup.Ct.J. 140, 141–42, 1987 WL 47847 (Dec. 19, 1987). In addition, the district court found as a factual matter that all of the defendants dealt with Dorney fairly and in good faith. The district court did not err in so finding. Therefore, as a matter of law and of fact, Dorney's contractual claim regarding a duty of fair dealing is without merit.

the purchaser party to the contract. As a matter of law, when a gas well owner reserves the right to take the production of the well in kind, the production of that well is not dedicated.[9A] We hold therefore that the district court did not err in finding that Dorney's gas was not dedicated in the B & A–Lone Star contract of May 11.[10] Since the gas was not dedicated, Dorney cannot now contend that ARCO is obligated to Dorney by virtue of that May 11 contract.[11]

## B. THE FRAUD CLAIM

 Dorney contends that ARCO (through B & A) committed fraud, as de-fined under Texas statutory law [12] and the common law, by falsely promising to prosecute B & A's take-or-pay claim against Lone Star for Dorney's benefit. Dorney argues that the false promise was intended to induce him to continue to perform under the farmout agreement. Dorney has made no showing of the reliance necessary to establish fraud. Dorney intervened in the take-or-pay case on December 27, 1985, before B & A agreed in principle to settle its claim with Lone Star. Dorney stated in his deposition that, following his intervention, he did not depend on ARCO or B & A to act on his behalf.

**9A.** *See, e.g., Nordan–Lawton Oil and Gas Corp. v. Miller,* 272 F.Supp. 125, 129 (W.D.La.1967) (holding that the properties are "dedicated" to a contract if a buyer is "given exclusive rights to purchase the reserves when the premises when and if produced"), *aff'd,* 403 F.2d 946 (5th Cir. 1968). *See also Valero Transmission Co. v. Mitchell Energy Corp.,* 743 S.W.2d 658, 660 (Tex. App.—Houston [1st Dist.] 1987, no writ). *See also generally, Louisiana Land and Exploration Co. v. Texaco, Inc.,* 478 So.2d 926, 927 (La.App. 4th Cir.1985), *rev'd and remanded on other grounds,* 491 So.2d 363 (La.1986).

**10.** As to Dorney's allegation that B & A's employee, Wilhite, orally promised to dedicate Dorney's gas to the B & A–Lone Star contract, the district court correctly held that any such oral dedication would be invalid. Dorney's gas in the ground was a mineral interest and thus was realty. The Statute of Conveyances, Tex. Prop.Code § 5.021 (Vernon 1984), and the Statute of Frauds, Tex.Bus. & Com.Code § 26.01(b)(4) (Vernon 1987), applies to any attempted conveyance or dedication of such realty. *See, e.g., U.S. Pipeline Corp. v. Kinder,* 609 S.W.2d 837, 840 (Tex.App.—Fort Worth 1980, writ ref'd n.r.e.); *Guffey v. Utex Exploration Co.,* 376 S.W.2d 1, 5 (Tex.App.—San Antonio 1964, writ ref'd n.r.e.). In addition, the Texas Statute of Frauds, Tex.Bus. & Com.Code § 26.01(b)(6) (Vernon 1987), would apply to the oral dedication alleged by Dorney since the alleged agreement was to be performed over ten years (i.e., the life of the B & A–Lone Star contract). As a matter of law, there is no writing regarding the alleged oral dedication in the instant case sufficient to satisfy the requirements of the Statute of Conveyances or the Statute of Frauds.

Dorney argues that he *partially performed* a dedication contract with B & A and Lone Star. This argument also must fail. For application of the partial performance exception to the Statute of Frauds, the performance must be unequivocally referable to the oral contract alleged. *See, e.g., Francis v. Thomas,* 129 Tex. 579, 106 S.W.2d 257, 260–61 (1937); *Kronenberger v. Beke,* 517 S.W.2d 664, 667–68 (Tex.App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.). That Dorney chose to market his gas through B & A to Lone Star does not show that Dorney dedicated his gas to either of the gas production contracts. To the contrary, Dorney reserved the right to take his production in kind. His performance of selling his gas through B & A to Lone Star is referable to the marketing provisions in the written Operating Agreements between the parties, not to an alleged oral contract of dedication.

**11.** Dorney argues that B & A is estopped from denying that Dorney's interest in the wells was dedicated under its gas purchase contract with HCP because, in calculating the amount of its take or pay claim against Lone Star, B & A included delivery capacity attributable to the interest of its co-owners. This argument is without merit. Lone Star's purchase obligation under the B & A–Lone Star contract, and B & A's purchase obligation under the HCP–B & A contract, is expressed as 85 per cent of "Seller's delivery capacity". Both contracts define the term "delivery capacity" as "the maximum amount of gas which Seller, having respect to prudent operations, can deliver...." Thus, Lone Star was required to take 85 per cent of the gas that B & A could deliver to it from the wells covered by the contracts. B & A had the right under those contracts to market gas owned by its co-owners if those co-owners did not take their production in kind. That right to market, however, does not mean that the co-owners' interest was dedicated. Quite the reverse, because of the ever-present right to take in kind, there was no dedication. In short, there was nothing inconsistent between the fact that the gas owned by ARCO's co-owners, including Dorney, was not dedicated to the contracts and the fact that B & A included delivery capacity attributable to co-owners' gas in calculating the amount of its take or pay claim against Lone Star.

**12.** Tex.Bus. & Com.Code § 27.01(a)(2) (Vernon 1987).

## C. THE DECLARATORY JUDGMENT ACTION

In his second amended complaint, Dorney requested, as an alternative to the damages for prospective breach requested in count one, that the court declare his rights under the farmout agreement and the two gas purchase contracts (of May 10 and 11) with regard to: 1) ARCO's and Lone Star's obligations to take the appropriate amount of their gas at the Section 107 price for the remaining life of the B & A–Lone Star contract; 2) ARCO's obligation to comply with the continuous development obligation contained in the farmout agreement;[13] and, 3) ARCO's obligation to enforce the B & A–Lone Star contract so as to protect his reversionary rights under the farmout agreement. Dorney argues that the district court failed to take into account the May 10 HCP/B & A contract in its declaratory judgment.

Dorney requested a declaratory judgment stating his rights under three contracts: the May 10 and 11 contracts and the farmout agreement. In the Defendants' Motion for Summary Judgment, the defendants argued for summary judgment as to the declaratory judgment issues only insofar as those issues related to the May 11 contract. Dorney argued, in his Response to Defendants' Motion for Summary Judgment, that, because his claims regarding the May 10 contract and the farmout agreement were not addressed in the Defendants' Motion for Summary Judgment, a grant of that motion would not constitute a final judgment as to all the issues in the case. The district court's opinion makes explicit reference only to the May 11 B & A–Lone Star contract and the farmout agreement. Dorney contends, therefore, that not all of his claims for declaratory judgment are decided by the district court's opinion.

Dorney's argument in this regard must fail. Although the district court does not make explicit reference to the May 10 contract, the significance of that contract is clearly defined by the district court's finding that Dorney's gas was not dedicated under the May 11 contract. The district court found that Dorney's gas *could* not have been dedicated because Dorney retained the right to take his gas in kind. The significance of the May 10 contract, according to Dorney, is that it shows that Dorney's gas was later "rededicated" in the May 11 contract.[14] The district court's finding that Dorney's gas was not dedicated under the May 11 contract and indeed *could* not have been dedicated is a clear rejection of Dorney's argument about the significance of the May 10 contract. In that way, the district court did account for all of the contracts with regard to which Dorney had requested declaratory judgment and declared Dorney's rights under all of those contracts.

## IV

In the injunction issued by the district court in its June 29, 1989 Final Judgment, the district court enjoins Dorney "from filing, prosecuting, or further litigating actions in the state courts[15] of Texas

---

**13.** In his Response to the Defendants' Motion for Summary Judgment, Dorney requested that this claim for declaratory judgment regarding the continuous development obligation be dismissed.

**14.** Specifically, Dorney has argued that "since the B & A/Lone Star May 11 contract dedicated to Lone Star all gas that was dedicated to B & A by HCP, reference must be made to the May 10 HCP/B & A contract to see what was rededicated to Lone Star".

**15.** Dorney argues that the Anti–Injunction Act, 28 U.S.C. § 2283 (1988), prohibits the district court from enjoining state court litigation of this case. That argument is incorrect. The Anti–Injunction Act applies only to pending state court actions. As the Supreme Court has stated,

> [The Anti–Injunction Act] and its predecessors do not preclude injunctions against the institution of state court proceedings, but only bar stays of suits already instituted.

*Dombrowski v. Pfister*, 380 U.S. 479, 483 n. 2, 85 S.Ct. 1116, 1119 n. 2, 14 L.Ed.2d 22 n. 2 (1965). Subsequent cases have uniformly held that the Anti–Injunction Act is applicable only to cases in which a state court action is already pending. *See, e.g., In re Corrugated Container Antitrust Litigation*, 659 F.2d 1332, 1334 (5th Cir.1981); *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 842 (1st Cir.1988) (applying the general rule to a removed case). There was no state court action pending in the instant matter at the

**1002**

or any other court in the United States, against Defendants, B & A, ARCO, and Enserch Corp. d/b/a Lone Star Gas Co., arising out of either the November 4, 1983 Farmout Agreement or the May 11–12, 1982 gas purchase contracts which were the subject of this action".[16] Because Dorney and ARCO are continuing to do business under the November 4 farmout agreement, new claims, independant of the current litigation, may yet arise under that contract. If ARCO were now to breach that contract in a manner unrelated to the present case, then Dorney would have a right to seek redress in court. The injunction, therefore, must be modified to allow for that contingency.[17]

### V

This Court, in reviewing a grant of summary judgment, reviews the motion de novo using the same criteria used by the district court in the first instance.[18] As stated in Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". "Material facts" are facts that might affect the outcome of the suit under the governing law.[19] A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict on that issue for either party.[20]

In this case, we agree with the district court that no genuine issue of material fact was raised by Dorney and AFFIRM the grant of summary judgment. We RE-

MAND this case to the district court for appropriate modification of the injunction.

---

time the district court issues its injunction. Therefore, the Anti–Injunction Act does not apply.

**16.** The district court here referred to the "May 11–12, 1982 gas purchase contracts". We assume that the district court meant to refer to the May 10 and 11 contracts.

**17.** Similarly, the injunction must allow for litigation of any claims that may have existed at the time of this lawsuit but exceeded the scope of Dorney's intervention.

**18.** See In re Aircrash at Dallas/Fort Worth Airport, 861 F.2d 814, 815–16 (5th Cir.1988); Walker v. Sears, Roebuck & Co., 853 F.2d 355, 358 (5th Cir.1988).

**19.** See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

**20.** Id. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12.