**WESTERN GAS PROCESSORS, LTD., Plaintiff–Appellant,**

v.

**WOODS PETROLEUM CORPORATION, W.A. Moncrief, Jr., doing business as Moncrief Oil Company, Defendants–Appellees.**

No. 92–1332.

United States Court of Appeals, Tenth Circuit.

Feb. 4, 1994.

Rehearing Denied March 11, 1994.

---

Gary C. Davenport (Eric A. Beltzer, also of McGloin, Davenport, Severson and Snow, with him on the briefs), Denver, CO, for plaintiff-appellant.

David W. Gratton (Thomas B. Humphrey, also of Evans, Keane, Koontz & Gibler, with him on the brief), Boise, ID, for defendants-appellees.

Before SEYMOUR, Chief Judge, and LOGAN and MOORE, Circuit Judges.

LOGAN, Circuit Judge.

This diversity action originated in a dispute over payment under gas purchase and sales contracts between the purchaser, Western Gas Processors, Ltd.[1] (plaintiff) and the sellers, Woods Petroleum Corporation (Woods) and W.A. Moncrief, Jr. (Moncrief) (collectively, defendants). Plaintiff filed this declaratory judgment action seeking a determination that "Plaintiff has properly and correctly paid all amounts due by Plaintiff to Defendants pursuant to the subject Contracts." I Appellant's App. 4.

Defendants counterclaimed, asserting, inter alia, breach of contract in calculating payment for gas.[2] The parties filed cross-motions for partial summary judgment. The district court determined that the contracts were ambiguous and denied the motions. At trial the jury returned a special verdict in favor of defendants on the issue of calculation of payments for gas.

Plaintiff appeals, asserting that the district court erred in finding (1) the contracts ambiguous and therefore denying summary judgment, (2) sufficient evidence to support the jury verdict that plaintiff improperly calculated payments to defendants for residue gas, and (3) sufficient evidence to support the jury verdict that the nonoperating working interest owners were entitled to recovery under the same terms as defendants Woods and Moncrief. We consider each of these issues in turn.

## I

In 1981, plaintiff entered into gas purchase and sales contracts with Woods and Moncrief. Plaintiff drafted the contracts. The contracts provided that plaintiff would purchase natural gas from defendants' wells in a Wyoming oil and gas field known as the Pine Tree Unit. Both contracts were later amended to include natural gas from additional wells. In addition, Woods, pursuant to a joint operating agreement with Moncrief and others who had ownership interests in gas and oil wells in the area (working interest owners), delivered and sold to plaintiff these working interest owners' gas. Whether that gas was purchased under the same terms and conditions as set forth in the Woods contract was disputed by the parties.

A dispute arose in 1986 concerning the price term of the contracts between plaintiff and defendants. The contracts contain several provisions that bear on determination of the price of residue gas. These provisions are as follow:

### ARTICLE I

### DEFINITIONS

. . . .

3) "Gas plant" or "plant" means any facilities necessary for or pertaining to the extraction of liquefiable hydrocarbons which may include but is not limited to tanks, machinery, equipment, fixtures, appliances, pipe, valves, fittings and material of any nature or kind whatsoever, including appropriate storage, shipping, dehydration, gas treating, and delivery facilities for plant products; all buildings and structures of any kind whatsoever located, or to

1. Western Gas Resources, Inc., now pursuing the appeal, is the successor to Western Gas Processors, Ltd., a Colorado limited partnership; Argent Energy, Inc. is the successor to defendant Woods Petroleum Corporation. I Appellant's App. 113. We will refer herein to the original parties to the contracts at issue.

2. Defendants also claimed plaintiff negligently and recklessly failed to properly maintain its gas gathering system and processing facility, and sought compensatory and punitive damages based on that claim. Plaintiff moved for judgment as a matter of law under Fed.R.Civ.P. 50(a), and the trial court granted that motion. Defendants do not appeal that ruling.

be located, on the site or sites at which the compressing and processing facilities of Processor are located, all easements pertaining to such site or sites and operation of the plant, and any and all other facilities and appurtenances located, or to be located, on or away from such site or sites deemed by Processor to be necessary for the successful operation of the plant, and any related gas gathering and compression systems, or return fuel systems [3] are also included in this definition.

. . . .

5) "Residue Gas" means that portion of the gas which remains after shrinkage due to any and all of following 1) recovery of plant products, 2) plant fuel requirements, and 3) normal losses in plant operations and 4) acid gas removal.

. . . .

## ARTICLE VIII

### METERS AND COMPUTATION OF VOLUMES

All gas volumes delivered hereunder shall be measured by an orifice meter or meters of standard make. . . .

. . . .

## ARTICLE IX

### DETERMINATION OF COMPOSITION

Representative determinations for hydrocarbon content shall be determined by gas chromatography. . . .

BTU values per cubic foot for components of the gas stream shall be calculated from analysis and using component heats of combustion specified in GPA Publication 2145–77.

Said tests and measurements shall be the basis for determining the price for gas purchased and sold.

## ARTICLE X

### ALLOCATION OF PRODUCTS AND RESIDUE GAS

. . . .

That portion of residue Gas Heating Value at Processor's plant which is attributable to each Producer meter location shall be determined by multiplying the total Gas Heating Value of residue gas delivered by Processor at the outlet of Processor's plant by a fraction, the numerator of which shall be the Gas Heating Value delivered to Processor's gathering system at each meter location less such meter location's share of the Product Heating Value of plant products allocated to the meter location, Gas Heating Value of the line losses attributable to the meter location, plant fuel gas heating value, and field compression fuel gas heating value, and the denominator of which shall be the total of all Gas Heating Value delivered at all meter locations less the total Product Heating Value of all plant products, Gas Heating Value of all line losses, plant fuel gas heating value and field compression fuel gas heating value attributable to all meter locations.

. . . .

## ARTICLE XI

### PRICE

The price paid to Producer at the point of delivery . . . [shall be] an amount equal to seventy percent (70%) [4] of the net sales proceeds . . . received for residue gas attributable to Producer's gas purchased hereunder. . . .

. . . .

Processor shall not enter into any Residue Gas Sales Contract, which provides for a Residue Gas sales price less than the maximum price allowed under the NGPA of 1978 and modified from time to time by the Federal Energy Regulatory Commission or any successor governmental body

---

3. The following language was added to the Woods contract by Amendment 4: "and such other systems as are necessary for the delivery and sale of residue gas." II Appellant's App. 234.

4. Amendments to the Woods contract provided for 80% of net sales under certain conditions. *See* II Appellant's App. 226 (Amendment No. 2); *id.* at 248 (Amendment No. 9).

having jurisdiction of such sale, without prior approval of Producer.

### ARTICLE XVII

### QUANTITIES AND QUALITY

.... It will be Processor's intent to expand its plant to accommodate larger rates within economic limits as deemed feasible in Processor's sole judgment.

II Appellant's App. 200 & 270; 205 & 275; 207; 209–11 & 277–280; 213 & 282.

During the first several years after the contracts were executed, all of the raw gas defendants sold to plaintiff was processed at plaintiff's only processing facility in the area, Hartzog Draw. During that time, plaintiff sold all of the residue gas to Panhandle Eastern Pipe Line Company (Panhandle) under a ten-year contract between plaintiff and Panhandle.[5] Thus, the calculation of the price allocated to defendants for residue gas was relatively straightforward: Panhandle paid plaintiff for the total heating value of residue gas delivered, and then each defendant received its share of the amount paid by Panhandle, based on the contract formula for determining each producer's portion of the total heating value of residue gas delivered at the outlet of plaintiff's plant.

Between 1982 and 1984, the contracts were amended to add additional Woods' wells. Plaintiff added pipelines to its gathering system in order to accommodate this additional gas. Production in the area continued to grow, and plaintiff expanded its processing capacity in response. Because of the expense of adding pipeline and compression facilities, plaintiff asked its producers for additional commitments. Defendant Woods and plaintiff executed Amendment No. 4 in July 1984, dedicating more wells to plaintiff, and arguably providing that Woods would receive "first call" if plaintiff could not process all of the gas provided to it by all of its producers. See II Appellant's App. 234–36. As the area gas fields developed, Woods negotiated more contract amendments with plaintiff, adding additional acreage to the original contract, and plaintiff added a sec-

ond delivery point for its Panhandle contract. In November 1985, plaintiff purchased the Hilight gas processing facility. Plaintiff processed some of defendants' and other producers' gas at Hilight, and sold the residue gas in excess of its Panhandle contract on the spot market for less than the Panhandle contract price. Defendants did not complain about receiving a lower price for the gas sold from Hilight on the spot market.

In March 1986, plaintiff purchased the Spearhead Ranch processing facility. Plaintiff sent gas from producers other than defendants to Spearhead, which increased its capacity to take defendants' gas at the other facilities. None of defendants' gas, however, flowed to Spearhead Ranch during the time in question. In October 1986, plaintiff began computing the price it paid to defendants for residue gas by pooling the revenue from residue gas produced at Hartzog and the physically connected facilities with the revenue from residue gas produced at Spearhead. Plaintiff received a significantly lower price for residue gas at Spearhead, and thus as a result of pooling proceeds from Spearhead with the proceeds from Hartzog and its physically connected facilities, defendants were allocated less money for residue gas. Defendants audited plaintiff's accounting records, and objected to the method of payment calculation and other aspects of the accounting. As the district court stated, "[t]he result [of pooling] was that defendants received a significantly smaller percentage of the higher price paid by [Panhandle]." I Appellant's App. 85.

### II

■ Plaintiff first asserts that the district court erred in finding the contracts were ambiguous. The parties do not challenge the district court's determination that Wyoming substantive law applied. "We review de novo a district court's analysis and interpretation of state law." *Amoco Rocmount Co. v. Anschutz Corp.*, 7 F.3d 909, 917 (10th Cir.1993).

■ Wyoming law provides that "[w]hether a contract is ambiguous is a question of law for the court." *Svalina v. Split*

---

5. The price Panhandle paid to plaintiff under the ten-year contract was a premium price.

*Rock Land & Cattle Co.,* 816 P.2d 878, 881 (Wyo.1991); *see also, e.g., Amoco Prod. Co. v. Stauffer Chem. Co.,* 612 P.2d 463, 465 (Wyo. 1980). An ambiguous contract is one "which is obscure in its meaning because of indefiniteness of expression or because of a double meaning being present." *True Oil Co. v. Sinclair Oil Corp.,* 771 P.2d 781, 790 (Wyo. 1989) (quoting *Farr v. Link,* 746 P.2d 431, 433 (Wyo.1987)). The court determines whether a contract term is ambiguous by reviewing the disputed term in context of the language of the whole contract, *State Farm Fire & Casualty Co. v. Paulson,* 756 P.2d 764, 766 (Wyo.1988), reading each part "in light of all other parts." *Amoco Prod. Co.,* 612 P.2d at 465.

■ Plaintiff asserts that the contracts "require pooling of proceeds from the sales of residue gas at the plant to be allocated among all producers who contributed gas to the plant." Brief of Appellant 16. We agree, based on our reading of the contract provisions quoted above. Specifically, Article I, subpart 5 defines residue gas as the gas left after "1) recovery of plant products, 2) plant fuel requirements, and 3) normal losses in plant operations and 4) acid gas removal." II Appellant's App. 200. Article X allocates to defendants a percentage of residue gas produced at the plant, based on the fraction of gas heating value each defendant delivered into the gathering system compared to the total gas heating value delivered into the system. The gas heating value placed into the system by defendants is measured at individual wellheads by the method set out in Article VIII. Article XI allocates to defendants a percentage of the proceeds plaintiff receives for residue gas attributable to defendants' gas. The contract thus provides that all proceeds for residue gas sold from the plant will be added together (*i.e.,* pooled) and allocated in relationship to the heating value of each producer's gas measured at the individual wellheads before moving into plaintiff's gathering system.

We do not agree with the district court that the "agreement is obscure and indefinite as to whether gas 'attributable to' [in Article XI] is measured by pooling, as for residue gas heating value, or whether it is measured by the actual physical amount of each defendant's residue gas, as for volume." I Appellant's App. 87. It is not possible to measure actual physical volume of an individual producer's residue gas; once a producer's raw gas is placed in the gathering system, it is no longer identifiable. Further, Article X provides that residue gas is attributed to each producer meter location based on a fractional formula that compares the gas heating value placed into the system at each of defendants' wellheads with the total gas heating value of residue gas produced at the entire plant. The contract, read as a whole, provides that proceeds from all of the residue gas ("net sales proceeds") produced at the *plant* are allocated back to each defendant based on the percentage of the gas heating value that they contributed to the *plant.* Thus, the definition of "plant" is critical in determining the price paid to defendants.

The definition of plant includes "any facilities ... deemed by Processor to be necessary for the successful operation of the plant." II Appellant's App. 200. The district court stated that under this definition, plant "arguably includes all of [plaintiff's] processing facilities, even those that are not physically connected." I Appellant's App. 87. Plaintiff argues that this definition "gives [it] the right to decide the composition of the facilities to be included as part of the plant." Brief of Appellant 22. Defendants argue that the definition of plant is limited to a facility to which its gas was actually transported, or at least to which its gas physically could have been transported.[6]

---

6. Defendants also suggested in their pretrial pleadings and throughout the course of the trial that the parties intended the price of residue gas paid to defendants be based upon the long-term gas contract between Panhandle and plaintiff. In other words, defendants suggest that the Panhandle contract was "dedicated" to defendants' contract with plaintiff, and they advance this proposition as an alternative argument in their brief on appeal. Defendants argue that if we reject the district court's determination that the contracts are ambiguous as a matter of law, we should rule that the contracts unambiguously require plaintiff to pay defendants "based upon the actual price paid to [plaintiff] for [defendants'] gas delivered to [plaintiff's purchaser, Panhandle]." *Id.* Because we affirm the trial

Plaintiff's reading of the contract language is so broad that "plant" arguably could include any of plaintiff's processing facilities, even if located hundreds of miles away from the Hartzog plant. The definition in the contract is circular; it defines "plant" as including anything that the processor deems necessary to successfully operate the "plant." We hold that the definition ·of plant is so vague that as a matter of law it renders ambiguous the price term which is dependent upon it.[7] Therefore, we agree that the district court properly denied summary judgment.

### III

We next address whether sufficient evidence was presented at trial to support the jury's verdict that plaintiff breached the contract by improperly calculating payments for gas purchased from defendants. "When a jury verdict is challenged on appeal, our review is limited to determining whether the record—viewed in the light most favorable to the prevailing party—contains substantial evidence to support the jury's decision." *Comcoa, Inc. v. NEC Teles., Inc.*, 931 F.2d 655, 663 (10th Cir.1991).

Although plaintiff characterizes the issue presented to the jury as whether the Panhandle contract was dedicated to defendants,[8] the only issue presented to the jury was whether plaintiff "breached its gas purchase contracts with defendants by not paying them the price required by the contracts." Supp.App. Part I, Instruction 12. The trial court correctly determined that the

contract provisions concerning price were ambiguous, and therefore it was the jury's duty to determine what the parties intended by the agreement. *Id.*, Instruction 13. *Intermountain Brick Co. v. Valley Bank*, 746 P.2d 427, 430 (Wyo.1987) (if court determines contract is ambiguous, "thereafter, 'there exists a question of intent which the trier of fact must resolve.'") (quoting *Goodwin v. Upper Crust of Wyoming, Inc.*, 624 P.2d 1192, 1195 (Wyo.1981)).

If the language of a contract is ambiguous, the surrounding circumstances must be considered in determining the intent of the parties. *See Mountain Fuel Supply Co. v. Central Eng'g & Equip.*, 611 P.2d 863, 868 (Wyo.1980). In ascertaining the intent of the parties, the trier of fact may consider the course of performance, course of dealing, and usage of trade. *See, e.g., id.* (citing Wyoming UCC); *see also Prenalta Corp. v. Colorado Interstate Gas Co.*, 944 F.2d 677, 687 (10th Cir.1991) ("Gas purchase contracts are contracts for the sale of goods and are governed by Article 2 of the Uniform Commercial Code (U.C.C.)." (citing Wyo.Stat. §§ 34.1–2–105(a), 34.1–2–107(a)).

Defendants presented evidence that combining of revenues from Hartzog and its connected facilities with Spearhead Plant revenues did not conform with the intent of the parties to the contract. *See* Appellee's Supp. App. 185. Given the ambiguous definition of plant, the jury could have determined that the parties intended "plant" to include only facilities through which defendants' gas actually flowed.[9] The jury also heard evidence

---

court's finding that the contracts were ambiguous, we need not address this issue.

7. Alternatively, if indeed plaintiff has the right to decide what facilities are included as part of the plant, such a definition is limited by the implied term of good faith and fair dealing present in every contract for the sale of goods. *See* Wyoming Stat. § 34.1–1–203 ("Every contract or duty within this act imposes an obligation of good faith in its performance or enforcement."). Section 34.1–1–201(a)(xix) provides the general definitions of terms in the U.C.C. " 'Good faith' means honesty in fact in the conduct or transaction concerned." At oral argument plaintiff's counsel conceded that there would be some limit on the distance from defendants' wells for a new facility qualifying as a part of the plant. Wheth-

er plaintiff acted in good faith in defining plant would be a jury question in this case.

8. Plaintiff asserts the evidence against dedication was overwhelming, *see* III Appellant's App. 437, 468, 515; however, defendants presented evidence that plaintiff promised defendant Woods the Panhandle price for residue gas. *See* Appellee's Supp.App. 197, 270, 273. In any case, the jury verdict for defendants was not dependent upon finding there was a dedication of the Panhandle contract.

9. This would explain why defendants did not object to the pooling of revenues from the Hilight spot sales; defendants' gas did flow to the Hilight facility during the time at issue.

that it was not physically possible for defendants' gas to be processed at the Spearhead Plant during the time period at issue. *See* Appellee's Supp.App. 115, 231–32. Thus, there was substantial evidence presented upon which the jury could have found that plaintiff's accounting method of including the Spearhead facility in its definition of plant, which allowed it to pool the lower priced Spearhead residue gas revenues with the higher revenues, was contrary to the intentions of the parties to the contract.[10]

We acknowledge that plaintiff put forward reasonable alternative interpretations of the price term of the contract, including an expansive definition of plant based in part on evidence that the parties expressed an intent to expand the plant to take greater quantities of gas. *See* II Appellant's App. 213. But the jury "has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact." *Kitchens v. Bryan County Nat'l Bank*, 825 F.2d 248, 251 (10th Cir. 1987). The record contains substantial evidence supporting the jury's verdict that plaintiff breached the contracts by improperly calculating the payments for gas.

## IV

▇▇▇ Finally, plaintiff asserts there was not sufficient evidence to support the jury's verdict that the working interest owners were entitled to the price provided by the Woods and Moncrief long-term contract.[11] We review the record in the light most favorable to the prevailing party, here the defendants, to determine whether there is "sub-

stantial evidence to support the jury's decision." *Comcoa, Inc.*, 931 F.2d at 663.

Defendants presented evidence that each of the working interest owners entered joint operating agreements with Woods. II Appellant's App. 367. Under these agreements, Woods delivered the gas, including its own, to plaintiff, and plaintiff paid Woods for all of the gas. Woods then paid each working interest owner its share of the proceeds and indemnified plaintiff against any claims for payment by the working interest owners. Appellee's Supp.App. 112–13, 124–26, 138–56, 262–70. Testimony was presented that this type of arrangement is common practice in the industry. *Id.* at 112–13, 161.

One of plaintiff's employees, Bruce Miller, testified that plaintiff required a division order, indemnity letter, adoption and ratification agreement, or seller's representative agreement before paying an operator such as Woods for redistribution to working interest owners.[12] *Id.* at 96, 138–39, 155–56. Miller further testified that each of these documents provided that plaintiff's purchase of the working interest owners' gas was pursuant to the terms of the long-term contract. *Id.* at 78, 142–50, 152–55. Defendants also presented testimony that during the time in question plaintiff paid only one check to Woods for all of the gas produced by Woods, Moncrief, and the other working interest owners, under one settlement statement, without any indication that working interest owners' gas was purchased at a different price from that under the long-term contract.

Plaintiff asserts that the working interest owners did not sign or, in the case of Moncrief, refused to sign the long-term gas pur-

10. Although plaintiff points out that "these proceeds were not kept by [plaintiff]," but were "paid to other producers" who sold to plaintiff gas that was processed at the Spearhead facility, Appellant's Reply Brief at n. 1, 2–3, such a practice may have helped plaintiff secure gas from other producers.

11. Plaintiff did not preserve for appeal the issue whether defendant Woods had authority to sue for the nonparty owners.

12. Plaintiff relies on *B & A Pipeline Co. v. Dorney*, 904 F.2d 996 (5th Cir.1990), for its assertion that division orders are title protection documents and not relevant to the contract issue in the instant case. *B & A Pipeline* is inapposite to the facts before us. In *B & A Pipeline*, the Fifth Circuit determined that a farm-out agreement could not provide for dedication to a long-term gas purchase contract because, inter alia, neither party to the farm-out agreement was a party to the long-term gas purchase contract, and the

chase and sale contract offered by plaintiff[13], and therefore are not entitled to the benefits of that contract.[14] The record on appeal, however, reveals evidence of written agreements, course of performance, and industry custom that support a conclusion that the parties intended that the working interest owners receive the same price for their gas as the gas delivered at the same time by defendant Woods. We agree with the district court that the record contains substantial evidence to support the jury's verdict.

AFFIRMED.

farm-out agreement contained no reference to the long-term contract or to its parties.

13. Although Moncrief did commit some wells to the long-term contract, see infra part II, he refused to commit most of his wells.

14. Plaintiff points out that the Woods contract was a ten-year contract requiring the producer to dedicate gas production (within limits) to defendants. Because the working interest owners did not take the risk of dedicating their gas to the ten-year term, plaintiff argues they should not reap the benefits of that contract.