**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 94-30055

_____

PEACHES ENTERTAINMENT CORPORATION

Plaintiff/Appellant/Cross-Appellee.

versus

ENTERTAINMENT REPERTOIRE ASSOCIATES, INC.

Defendant/Appellee/Cross-Appellant.

_____

Appeal from United States District Court
for the Eastern District of Louisiana

_____

August 16, 1995

Before HIGGINBOTHAM, SMITH and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Peaches Entertainment Corporation ("PEC"), owner of the federally registered service mark PEACHES, appeals the district court's judgment, which held that Entertainment Repertoire Association, Inc. ("ERA"), retained limited, exclusive rights to use a similar mark within stores in two parishes in Louisiana and advertise in five more. ERA appeals the district court's holding that limited future store expansion to the two parishes where it had operated stores. For the following reasons, the judgment of the district court is affirmed in part, modified, and remanded with directions.

BACKGROUND

Peaches Entertainment Corporation, a retail music and video chain, operates twenty-one locations in six states. It is the

owner of the federally registered service mark PEACHES for "retail tape and record services," the mark having been registered by a corporate predecessor, Lishon's Inc. ("Lishon's"),[1] on July 6, 1976. Lishon's began using the mark in commerce in relation to music stores sometime in 1974.

Likewise, ERA owns a retail music and video store in New Orleans, Louisiana, which does business under the trade name PEACHES.[2] ERA first began to use the name PEACHES and a related graphic service mark in August 1975, when it opened stores in both Orleans and Jefferson Parish.

ERA's PEACHES fame spread beyond the Louisiana area, and Lishon's learned of ERA's use of the PEACHES name and mark. On December 2, 1975, Lishon's sent a cease and desist letter to ERA notifying it of its claim to the PEACHES trademark and demanding that ERA stop using the trademark PEACHES in connection with its Louisiana music stores. ERA responded, by letter, that when it first began to use the trademark PEACHES, it was unaware of Lishon's prior use of the trademark. Because Lishon's did not reply to its letter, ERA assumed that it continued to have the

---

[1]Lishon's, which changed its name to Peaches Records and Tapes, Inc., filed for bankruptcy in 1981. PEC subsequently acquired many of its assets, including the PEACHES service mark.

[2]The parties have stipulated that the owners of ERA were inspired to use the mark and name PEACHES after listening to a hit record by the Allman Brothers entitled "Eat a Peach." The album, which was produced by Capricorn Records, was marketed to record stores in a peach crate marked with the illustration of a peach. In July 1975, ERA obtained permission from Capricorn to use PEACHES as a word mark and Capricorn's illustration as a design mark. ERA was unaware of PEC's predecessor's use.

2

right to use the PEACHES trademark in Louisiana.  Consequently, ERA's use of the trademark neither ceased nor desisted, and it continued to expand its operations.  By May 1980, ERA operated six stores in Louisiana, two stores in Jefferson Parish and four stores in Orleans Parish.  In 1981, Lishon's filed for bankruptcy and sold the PEACHES trademark to PEC.

In 1992, when PEC learned of ERA's use of the mark PEACHES, it brought an infringement suit in federal court under the Lanham Trademark Act of 1946, seeking an injunction and damages.  See 15 U.S.C. § 1221.  At that time, ERA was operating only one store in Orleans Parish, although the one store was extremely profitable. ERA defended on the grounds that it was an "intermediate junior user," entitled to exclusive use of the trademark within the territory that it had established prior to the federal registration of the mark.  The district court agreed.

The triable issues that remained were limited to determining the extent of PEC's right to use the PEACHES service mark and ERA's additional defense of laches.  After considering the evidence, the district court held that ERA's use was protected under two doctrines.  First, ERA was an intermediate junior user and, second, PEC was estopped by laches from encroaching on ERA's territory on account of its seventeen-year delay in pursuing its rights. Moreover, the court stated that it would not hold ERA to a "strict standard" of proof of its trade territory, because of the delay. To determine the trade territory, the district court determined ERA's trade territory based "primarily on the evidence of the

3

geographic extent of ERA's continuous radio advertising and its reputation."  It also relied on ERA's evidence "regarding the geographic origin of its customers."  This evidence came primarily from Harris and Shirani Rea, who co-owned and operated ERA.  The district court issued a permanent injunction that allowed ERA to advertise in a seven parish territory,[3] but limited future store expansion to Orleans and Jefferson Parish, the two parishes where ERA had operated stores.

LAW

In 1946, Congress passed the Lanham Act in order to federalize the common law protection of trademarks used in interstate commerce.  See Lanham Trademark Act of 1946, c. 540, 60 Stat. 427 (codified as amended at 15 U.S.C. §§ 1051-1127).  The Act was designed to protect both consumers' confidence in the quality and source of goods and services and protect businesses' goodwill in their products by creating a federal right of action for trademark infringement.  S. Rep. No. 1333, 79th Cong., 2d Sess. at 1, reprinted in 1946 U.S. Cong. Serv. 1274, 1274.  Owners of a federally recognized trademark, 11 U.S.C. § 1052, service mark 11 U.S.C. § 1053, or other collective mark, 11 U.S.C. § 1054; see also, 11 U.S.C. § 1127 (defining types of marks),[4] may bring suit in federal court for damages or injunctive relief against users of

_____

[3]These seven parishes are:  Orleans, Jefferson, Plaquemines, St. Bernard, St. Tammany, St. Charles, and St. John the Baptist.

[4]Insofar as the applicable law here is concerned, the terms "service mark" and "trade mark" are synonymous.  Cf.  Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc., 510 F.2d 1004, 1009 (5th Cir.), cert. denied, 423 U.S. 868 (1975).

4

similar marks whose use is "likely to cause confusion, or to cause mistake, or to deceive."  11 U.S.C. § 1114.

The basic scheme that creates rights under the Lanham Act is a national registration system.  Under the common law, use of a distinctive mark in commerce only created a right through priority and market.  See United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97 (1918) ("There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed.").  The Lanham Act, however, changed the common law rule by allowing a user to acquire rights in a mark by registration.  To complicate this process, however, Congress also created several defenses to a registered-user's rights.  Significant to this case, junior users, parties who use a mark subsequent to another's use, may retain rights.  If the use predates the senior user's registration,[5] then the Act provides a defense if the mark "was adopted without knowledge of the registrant's prior use and has been continuously used by such party . . . from a date prior to registration of the mark . . ."  11 U.S.C. § 1115(b)(5).  The rights of a junior intermediate user, however, "apply only for the area in which such continuous prior use is proved." 11 U.S.C. § 1115(b)(5); see generally, 3 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26.18[1] (3d ed. 1994) (examining "limited area defense").  The junior user's area of continuous prior use, which is frozen at the time the senior

---

[5]The 1988 amendments to the Act made certain changes to this doctrine that are not relevant to the case at hand.

user obtains registration, see John R. Thompson v. Holloway, 366 F.2d 108, 116 (5th Cir. 1966); and Dawn Donuts Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 360 (2d Cir. 1959), becomes the junior user's trade territory.

The junior user may establish his trade territory by identifying the "zone of reputation" acquired for his mark. See William J. Gross, Comment, The Territorial Scope of Trademark Rights, 44 U. MIAMI L. REV. 1075, 1084-87 (1990); see also, Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 415-16 (1916) ("Into whatever markets the use of a trademark has extended, or its meaning has become known, there will be the manufacturer or trader whose trade is pirated by an infringing use be entitled to protection and redress." [emphasis added]); Thrifty Rent-A-Car System, Inc. v. Thrift Cars, Inc., 639 F. Supp. 750, 753 (D. Mass. 1986), aff'd., 831 F.2d 1177 (1st Cir. 1987) ("A party who has established a reputation in an area may acquire exclusive rights to its mark there, even though the product bearing the mark is unavailable."); Quill Corp. v. LeBlanc, 654 F. Supp. 380, 385 (D.N.H. 1987) ("At the point in time of registration, the junior user's current market -- its 'area [of] continuous prior use' . . . -- is frozen, and . . . the junior user's reputation, advertising, and sales delimit its frozen area." [citations omitted]); and 3 McCarthy, supra, § 26.12[1] at 26-41 ("The territorial scope of a trademark and its goodwill must be defined in terms of the area from which customers are drawn, the coverage of advertising media and the nature of goods or services sold.").

6

Provided that the junior user has significant sales in the areas the mark has gained reputation, these areas comprise the junior user's trade territory at the time the senior user obtained registration. See Thrifty Rent-A-Car System, 639 F. Supp. at 753. Advertising alone cannot establish the junior user's trademark rights in an area. Id.

STANDARD OF REVIEW

We review the trial court's granting or denial of permanent injunction for abuse of discretion. See Merrill Lynch v. Stidham, 658 F.2d 1098 (5th Cir. 1981) (holding that the trial court had not abused its discretion in permanently enjoining the defendants); see also, Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 939 (4th Cir. 1995) (noting that abuse of discretion is the appropriate standard of review for a granting or denial of permanent injunction). The district court abuses its discretion if it (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief.

"The standard of review over the district court's grant of a permanent injunction must, of course, be segmented according to the component functions performed by the district court." Multnomah Legal Serv. Workers Union v. Legal Serv. Corp., 936 F.2d 1547, 1552 (9th Cir. 1991). Thus, we will review the district court's

7

findings of fact under the clearly erroneous standard, and the conclusions of law under the de novo standard.

Historically, finding the territorial scope of trademark rights has been a question of fact. 3 McCarthy, supra, § 26.12[1] at 26-41; see also, Federal Glass Co. v. Loshin, 224 F.2d 100, 102 (2d Cir. 1955); cf. American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619, 627 (5th Cir. 1963) ("The ancient observation that each trade-mark case must be decided upon its own facts still obtains . . . ."). We overturn the district court's factual findings only if they are clearly erroneous. Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695, 703 (5th Cir. 1981). The determination of the proper legal standard for assessing a junior or senior user's trade territory is a question of law that we review de novo. See id.

If we find that the district court misapplied its factual findings and/or legal conclusions when fashioning its permanent injunction, we must remand the case for modification of the order. Modifications of an order granting injunctive relief "cannot be devised from on high. The district court must bear the responsibility for doing so." See United States v. Lawrence County School Dist., 799 F.2d 1031, 1047 (5th Cir. 1986); see also, B & A Pipeline Co. v. Dorney, 904 F.2d 996, 1002 (5th Cir. 1990) (remanded the case with directions that the court modify its judgment in order to limit the permanent injunction placed on the defendant); and Premier Indus. Corp. v. Texas Indus. Fastener Co., 450 F.2d 444, 448 (5th Cir. 1971) (remanded the case with

8

directions that the district court modify its judgment in order to extend the time of the injunctive relief).

ANALYSIS

I. SIZE OF TRADE AREA

PEC contends that the district court made several errors in determining the size of ERA's trade area. Initially, it contends that the district court erred in not holding PEC to a "strict proof" of its trade area. Our research has found no jurisprudence to the effect that ERA should have been held to a "strict proof" requirement and PEC has virtually conceded this point in its reply brief.

PEC also contends that the district court relied on inadmissible hearsay adduced at trial in making its judgment. The testimony at issue is that of Harris Rea and his wife. They testified that they drew their customers primarily from within seven parishes and sometimes beyond. They based their testimony on their business experiences acquired through the day-to-day operation of the record store and personal contacts with customers who sought out their wide inventory mix of rhythm and blues, blues, jazz, gospel, and rap music. ERA stocked hard-to-find collector's items and music indigenous to Louisiana such as cajun, zydeco and dixieland jazz. PEC concedes that it did not object to this testimony during trial.

In this circuit, "unobjected-to hearsay may be considered by the trier of fact for such probative value as it may have." Flores v. Estelle, 513 F.2d 764, 766 (5th Cir.), cert. denied, 423 U.S.

989, 96 S.Ct. 401, 46 L.Ed.2d 308 (1975). When a party fails to object to the admission of evidence, we can review only for plain error. Permian Petroleum v. Petroleos Mexicanos, 934 F.2d 635, 648 (5th Cir. 1991); Fed. R. Evid. 103(d). Plain error is error which, when examined in the context of the entire case, is so obvious and substantial that failure to notice and correct it would affect the fairness, integrity, or public reputation of judicial proceedings. Permian Petroleum, 934 F.2d at 648.

At trial, it was established that the retail record business is a cash-and-carry business. Most customers pay by cash or check, leaving no written record of their residence. Thus, the testimony of Harris Rea was probative as to the location of the customer base. It also gave every indication of being reliable, particularly in view of the absence of any contrary evidence presented by PEC. See Flores, 513 F.2d at 766 (holding that "unobjected-to hearsay may be considered by the trier of fact for such probative value as it may have"). Moreover, the district court also heard testimony of ERA's extensive radio advertising and promotion activity, which the district court relied upon in issuing the permanent injunction. Consequently, the alleged hearsay testimony was not the sole basis for the district court judgment. We find no error in the admission of this testimony that would have affected the fairness, integrity or public reputation of the district court proceedings.

10

II.  ERA'S TRADE TERRITORY

The trial court identified ERA's trade territory, which was frozen at the time Lishon obtained registration of the PEACHES mark, using uncontroverted testimony regarding ERA's reputation, advertising and sales in the areas in which it concentrated its advertising.  We hold that the zone of reputation -- that is, the reputation, advertising, and sales proven in a given service area -- may be used to determine a junior or senior user's trade territory.  Therefore, the trial court did not err in relying on ERA's zone of reputation to classify ERA's trade territory.

In calculating ERA's trade area, the trial court made the following factual findings:

> On August 1, 1975, Smith and Rea began using the service mark PEACHES on exterior and interior signs, point-of-sale displays at its original locations in Gretna and on Elysian Fields and on bags for purchased merchandise.  At that time it also began distributing flyers using the PEACHES service mark and word mark in various other forms of advertising is uncontroverted.  In this vein, Rea testified that in <u>August 1975, ERA began advertising on numerous radio stations</u> in the metropolitan area of New Orleans, including WXEL (which is now WLTX-FM), WNNR (which is now WYAT), WYLD-AM and FM, WBOK, WTIX and WRNO-FM[.] . . . The coverage areas for the broadcast signals of the radio stations on which ERA advertised all include Orleans and Jefferson Parishes and most include all of the parishes south of New Orleans to the Gulf of Mexico, all of the parishes on the north shore of Lake Ponchartrain and across the state line well into Mississippi on the north and east, past Baton Rouge to the northwest, and past Lafayette to the west.

The trial court deduced that the market served continuously by ERA's PEACHES prior to Lishon's registration included the greater New Orleans area (i.e., Orleans Parish), and its contiguous

parishes, Jefferson, Plaquemines, St. Bernard, St. Tammany, St. Charles and St. John the Baptist.

Our review of the record, and in particular the trial court's memorandum opinion, demonstrates that the trial court's determination of ERA's trade territory was based upon cumulative evidence regarding ERA's reputation. The trial court's determination was not made on the basis of the radio signals going out to various far-reaching areas, but rather on recognized sales coming in from particular localities. A comparison of the radio signals and the court-recognized trade territory reveals that the radio signals through which ERA advertised clearly went far beyond the seven parishes identified as ERA's trade territory. For example, some of the radio signals stretched to the Gulf of Mexico, while others penetrated Mississippi. Evidence adduced at trial magnifies the incongruity between ERA's sales and the radio signals. Harris Rea testified that ERA's PEACHES store survived despite the presence of two nearby Sound Warehouse stores because of ERA's ability to draw from a larger trade area than the PEACHES stores' immediate neighborhoods. He further testified that PEACHES' "reputation" and "customer loyalty" regularly drew customers from the following parishes: Orleans, Jefferson, St. Tammany, Tangipahoa, St. John the Baptist, St. Charles, St. Bernard and Plaquemines. The trial court carefully tailored the trade territory to conform with evidence regarding ERA's sales; it did not rely solely on ERA's advertising evidence. Because ERA proved its reputation, advertising and sales in these seven parishes, the

12

trial court delineated these parishes as ERA's trade territory.  We cannot say that the trial court's factual finding of ERA's trade territory, which was fully supported by testimony and evidence at trial, was clearly erroneous.


III.  EXPANSION LIMITATION

Both parties appeal the restrictions placed on ERA's ability to expand within the trade area.  PEC argues that ERA should be limited to the one store that is operating now, despite the fact that its trade area covers seven parishes.  We find no support for this contention in the case law.  As an intermediate junior user, ERA has the right to fully exploit the market potential of its trade area.  Dawn Donuts Co., 267 F.2d at 362.  PEC's rights are not affected by the opening of one store or one hundred stores as long as ERA does not infringe upon PEC's trademark outside of the seven parish trade area.  We find PEC's argument to be without merit.

ERA appeals the portion of the district court's judgment that limits it from opening new stores outside of the Orleans and Jefferson Parish parts of the trade area.  Harris Rea testified that ERA's specialization in ethnic music and its wide inventory of Louisiana music had gained it a loyal following.  He also testified that gross revenues for the single store had been growing over the last few years despite competition from large franchise stores.  As noted above, in 1991, gross revenues were $345,000.  In 1992, they were $455,000.  In 1993, they were $650,000.  By July 31, 1994,

13

gross revenues exceeded $750,000. He testified that gross revenues by square footage in 1994 was $417 dollars per square foot, which is approximately three times the industry average of $165 dollars per square foot.

Rea testified that in order to increase profitability in the future, he had planned to expand the size of his store in Orleans Parish as well as open new stores within the trade area. By opening new stores, he stated that he would be able to spread management costs over several stores and generate more sales for the same advertising dollar. Rea also testified that the new stores would make ERA eligible for volume discounts from record manufacturers and distributors.

Based on this uncontroverted evidence at trial, the district court stated in its memorandum opinion that:

> It appears incongruous for a court to limit an intermediate junior user to a specific retail location or a set of specific locations within its defined Trade Territory when the law is precisely to the effect that an intermediate junior user is entitled to freely use its mark within the confines of its established trade territory without interference by the registered owner of the mark. Accordingly, the Court is of the opinion that it is inappropriate to interfere with the ERA's use of its mark within its Trade Territory by delineating specific locations therein where the intermediate junior use is permitted [to] utilize its mark. [Footnote omitted.]

This conclusion comports perfectly with the principle that an intermediate junior user is entitled to fully exploit its trade area. See Dawn Donuts, 267 F.2d at 362.

14

In its judgment, however, the district court limited the opening of new stores to the Orleans and Jefferson Parish, explaining its reason for the restriction:

> The court imposes such restriction for the sole purpose of avoiding the possibility of a prohibited expansion of the intermediate junior user's trade territory which would logically follow the establishment of additional retail locations approaching the outer boundaries of ERA's Trade Territory.

This restriction is unsupported by the record or law. There was no evidence adduced at trial indicating that a restriction on the physical location of an ERA store was required to prevent the expansion of ERA's trade area. In fact, the evidence at trial was that the opening of new stores was planned by ERA as a means of exploiting the existing trade area. This evidence was not contested by PEC. Neither the district court nor PEC cites any case that has allowed this type of restriction on the location of a store within a trade area, nor has our own research produced any case law that has imposed this type of restriction.

The district court reached the factual conclusion that ERA's trade area consisted of seven contiguous parishes in South Louisiana. This conclusion was fully supported by the evidence and testimony submitted at trial. Having reached that conclusion, it was error for the district court to restrict the location of any of ERA's future stores to Orleans and Jefferson Parish.[6]

---

[6]We do not address the merits of the laches defense upheld by the trial court because a discussion of this defense is not necessary to sustain the judgment.

CONCLUSION

For the foregoing reasons, we REMAND the cause to the district court, and the district court is directed to MODIFY its judgment, consistent with this opinion, by removing the stricture prohibiting ERA from opening new stores outside of Orleans and Jefferson Parish. In all other respects, the judgment of the district court is AFFIRMED.

Affirmed in part, modified, and remanded with directions.